[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-13473

_____

U.S. Tax Court Docket Nos. 28207-08, 28208-08, 28210-08

SANDRA K. SHOCKLEY, et al.,

Petitioners-Appellants,

versus

COMMISSIONER OF INTERNAL REVENUE,

Respondent-Appellee.

_____

Appeal from the United States Tax Court

_____

(October 3, 2017)

Before TJOFLAT and WILSON, Circuit Judges, and ROBRENO,[*] District Judge.

_____

[*] Honorable Eduardo C. Robreno, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

ROBRENO, District Judge:

Terry and Sandra Shockley, a husband and wife duo, formerly owned a television and radio company called Shockley Communications Corporation ("SCC"). In conjunction with their retirement, the Shockleys sold SCC and reported their gains from this sale on timely federal income tax returns for calendar year 2001. In September 2007, the Commissioner of the Internal Revenue Service ("IRS") assessed additional tax liabilities against SCC for its tax year ending May 31, 2001, and subsequently asserted transferee liability under I.R.C. § 6901 against each of eight of the largest selling shareholders, including Terry and Sandra Shockley.

The Tax Court upheld the Commissioner's transferee liability assessment. The Shockleys, along with another former SCC shareholder, Shockley Holdings, L.P. (collectively, "Petitioners"), now appeal this ruling, arguing that the Tax Court erred in assessing tax liabilities against them as transferees under both federal and state laws. For the reasons that follow, we will affirm the decisions of the Tax Court.

I.

The facts giving rise to this appeal—some of which are stipulated, and none of which are disputed—are lengthy and complex. Drawing largely on the Tax Court's recitation in the opinion below, we organize this tortuous series of

2

transactions into the following broad categories: the decision to sell, negotiations, structuring the transaction, the agreements, closing and results, and the tax consequences of all the foregoing.

A.
Decision to Sell

After purchasing a radio station in Madison, Wisconsin, in early 1985, Terry and Sandra Shockley incorporated SCC, a closely held corporation, under the laws of Wisconsin.  Between 1985 and 2000, SCC grew to own five television stations, a radio station, and a video production company in Wisconsin, as well as a television station and several radio stations in Minnesota.  SCC brought in additional investors during this time to fund its significant business expansion.

SCC eventually came to be owned by 29 separate shareholders, including Petitioners, several other individuals, a number of investment funds, and the State of Wisconsin Investment Board (collectively, "SCC shareholders").  Terry and Sandra, who each separately owned 10.18879% of SCC's common stock, served as members of the SCC Board of Directors ("SCC Board").  Terry also served as SCC's president and treasurer, and Sandra served as SCC's vice president and secretary.  Shockley Holdings L.P.—an entity owned by the Shockleys, as general partners, and their adult children, as limited partners—owned 3.52508% of SCC's common stock.

3

The Shockleys began considering their retirement options in 1999. On January 21, 2000, they met with Stephen A. Schmidt ("Schmidt"), a managing director and tax partner of a professional audit, tax, and consulting services firm called RSM McGladrey, Inc. ("RSM"). During this meeting and through later communications, the Shockleys, other members of the SCC Board, and RSM discussed the following six potential alternative futures for SCC: (1) a sale of assets by SCC followed by its liquidation; (2) a sale of SCC stock; (3) tax-free reorganizations under I.R.C. § 368; (4) a "spin-off" of the SCC's radio assets under I.R.C. § 355, followed by a sale of SCC stock; (5) redemption of SCC stock from the SCC shareholders; and (6) a sale of SCC stock using an employee ownership plan. Schmidt also introduced the Shockleys to Integrated Capital Associates ("ICA"), a firm that facilitated stock sales of companies.

In February 2000, the Shockleys met with media broker Kalil & Co., Inc. ("Kalil") to further discuss potential alternatives for the future of SCC. On April 5, 2000, Terry signed an agreement authorizing Kalil "to act as exclusive broker in the sale of all of [SCC's] assets." Appellee's Corrected Suppl. App. Tab 5 (Ex. 23-J). After this exclusive brokerage agreement was in place, Kalil began seeking potential buyers for SCC. Around the same time, in April 2000, the Shockleys met with Eric Sullivan, a principal of ICA, to learn more about his company's services.

4

Over the next several months, the Shockleys continued to seek and receive advice from RSM and communicate regularly with Kalil regarding efforts to sell SCC. RSM presented the Shockleys with analyses that compared the projected impacts on both buyers and sellers of a stock sale versus an asset sale. One such analysis, which assumed a value of $190 million for SCC's radio and television assets, showed net after-tax liquidation proceeds to SCC shareholders of $94 million for a hypothetical stock sale, but only $75 million for the correlating proceeds of a hypothetical asset sale. After reviewing this analysis, and out of concern that a piecemeal sale of SCC's assets over time might negatively impact employee retention and decrease productivity, the SCC Board initially decided to pursue a stock sale.

This decision notwithstanding, Terry subsequently discovered that the general preference of buyers in the broadcasting industry was an asset sale. Further, although Kalil was able to find potential buyers interested in SCC's assets, the Shockleys learned it was unlikely that a broadcasting business would be interested in buying the stock of a company, like SCC, that had both television stations and radio stations; buyers who were interested in small-sized-market radio stations generally were not interested in medium-sized-market television stations, and vice versa.

5

B.

Negotiations

In May 2000, a purchase offer for SCC's television assets was made by an Illinois-based media company named Quincy Newspapers, Inc. ("QNI"). Structured as an asset sale, QNI's offer tendered a purchase price of $160 million for SCC's television stations and production company. These items comprised approximately 95% of SCC's total radio and television assets. No agreement was reached immediately, but negotiations continued throughout the summer of 2000.

Meanwhile, in a letter dated June 7, 2000, Kalil made Terry aware of two separate companies—Fortrend International, LLC ("Fortrend"), and Diversified Group ("Diversified")—that had each expressed willingness to buy the stock of SCC and then sell its assets to third-party buyers. As Kalil explained in the letter, this "buy stock/sell assets" transaction would, with either Fortrend or Diversified, proceed as follows:

> It looks like they negotiate a fee of somewhere between 5-7% on the gain. You would sell them the stock and they would sell the assets to a buyer. Both applications would be filed with the [Federal Communications Commission ("FCC")] concurrently and they would "own" [SCC] for about one hour. They feel confident that their tax attorneys can explain this in such detail as to give both buyer and seller total comfort.

Appellee's Corrected Suppl. App. Tab 7 (Ex. 27-J).

In late August 2000, Schmidt arranged a conference call for the Shockleys and several others to speak with David Kelley, who worked at ICA. The agenda

6

for the call included an overview of ICA, the possible use of a "Midco" transaction for the stock sale of SCC,[1] and a discussion as to why ICA should be selected over Fortrend or Diversified.  During this conference, the Shockleys and other attendees were informed of a risk that the IRS might recharacterize the transaction as an asset sale.  ICA, however, represented that none of the similarly structured transactions it had facilitated over an 18-year period had been successfully challenged or unwound.

In September 2000, QNI indicated that it was willing to consider structuring the transaction as a purchase of SCC's stock instead of assets, and it asked Kalil to provide SCC's asking price for the stock.  In response, Terry drafted a letter to QNI that (1) showed SCC's projected purchase prices for a stock sale and, alternatively, for an asset sale; (2) indicated that SCC could proceed with a transaction structured either way; (3) provided an analysis comparing an asset purchase with a stock purchase; and (4) explained that the cash savings to SCC of a stock sale, rather than an asset sale, would be $11 million.  *See* Appellee's Corrected Suppl. App. Tab 58 (Ex. 349-J).  He noted in this letter that SCC had a

---

[1]     "Midco," which stands for "middle company," generally refers to a transaction in which "the seller engages in a stock sale (thus avoiding the triggering of built-in gain in appreciated assets) while the buyer engages in an asset purchase (thus allowing a purchase price basis in the assets), through use of an intermediary company." *The Growing Threat of Transferee Liability in Midco Deals*, Law360, July 5, 2016, *available at* https://www.law360.com/articles/813956/the-growing-threat-of-transferee-liability-in-midco-deals.

"'Midco' company arrangement standing by to proceed."[2] *See id.* QNI did not agree to the terms presented in that letter and never agreed to buy the stock of SCC, but it remained interested in the television assets nonetheless. Kalil therefore continued to negotiate with QNI, on behalf of an ICA affiliate, regarding the price and terms of a potential sale of SCC's assets.

The SCC shareholders represented on the SCC Board finally decided in the fall of 2000 that they would sell SCC's stock to an affiliate of ICA.[3] Terry informed Kalil that this was their intention.

## C.
### Structuring the Transaction

On October 6, 2000, ICA organized Northern Communications Acquisition, LLC ("NCA LLC"), a Delaware limited liability company. On October 13, 2000, NCA LLC executed a trust agreement with Roger Ohlrich, an agent of ICA, forming Northern Communications Statutory Trust ("NCS Trust") under the laws of Connecticut. According to the trust instrument, for which NCA LLC acted as

---

[2]    The letter further provided that "[i]n discussions with . . . our FCC Counsel, we have been assured both that the Midco purchase of SCC stock and the Midco sale of the TV assets to QNI can proceed simultaneously with the FCC and should not significantly delay a Closing." *Id.*

[3]    Although SCC had 29 total shareholders at that time, a provision in its shareholders' agreement provided that if shareholders owning 65% or more of the shares "determine[d] to sell or otherwise dispose of all or substantially all of the assets of [SCC] or all of the capital stock of [SCC]," they could compel the remaining shareholders to vote in favor of the asset sale or participate in the stock sale. Appellee's App. Tab 55 (Ex. 328-J, § 3.4(a)). At the time this decision was made, the largest shareholders were the State of Wisconsin Investment Board (24.57%), Allsop Venture Partners III, L.P. (21.87%), and Petitioners (collectively, about 23.9%).

trustor and beneficiary and Ohlrich acted as trustee, NCS Trust was established for the sole purpose of acquiring the stock of SCC.[4]

Also on October 6, 2000, QNI faxed a nonbinding letter of intent to ICA regarding QNI's purchase of the television assets from an undisclosed client of ICA.[5]  Kalil negotiated with QNI regarding the final price of the potential purchase, and on October 27, 2000, QNI sent Kalil—who was working on behalf of the still-undisclosed client of ICA that would ultimately sell QNI the television assets—a revised draft of the nonbinding letter of intent.  On October 31, 2000, Kalil, on behalf of this seller, sent QNI a letter accepting its offer to purchase the television assets.

Although the intent was for QNI to purchase all of SCC's television assets, FCC regulations prohibited QNI from purchasing the Minnesota television station because of market conflict.  QNI, however, still desired an economic benefit from its relationship with the Minnesota television station, as well as an option to buy it later, if possible.  To accommodate QNI, the Shockleys organized a company called TSTT, LLC ("TSTT"), a Wisconsin entity that would purchase the

---

[4]    Frank Taboada, counsel for ICA, NCS Trust, and the affiliated entities of NCS Trust, explained at trial that it is customary to create entities specifically for a particular transaction.

[5]    This client was later identified as NCS Trust, the ICA affiliate established on October 13, 2000.

Minnesota television station from NCAC.  At some point prior to January 23, 2001, TSTT was renamed Shockley Broadcasting, LLC ("SB LLC").

On December 1, 2000, counsel for ICA incorporated Northern Communications Acquisition Corp. ("NCAC"), a Delaware corporation and wholly-owned subsidiary of NCS Trust.  NCAC was created to serve as the entity that would purchase the SCC stock.  Ohlrich became the president of NCAC, as well as the chairman and sole member of its board of directors.

Terry did not conduct any in-depth background investigation of NCS Trust or NCAC, and the SCC shareholders voiced concerns during stock purchase negotiations about the creditworthiness of NCAC.  ICA responded to these concerns by forming Northern Communications Fund, LLC ("NC Fund"), which was wholly owned by ICA-related entity Integrated Acquisitions Group, LLC ("IAG").  NC Fund and another entity, Slabfork LLC, then became the 85% and 15% owner-members, respectively, of the already-established NCA LLC.  In a letter dated December 28, 2000, written to Terry in his capacity as shareholder representative, IAG represented that it would cause NCAC to be capitalized using either cash or technology interests via NC Fund, NCA LLC, and NCS Trust.

D.
The Agreements

By the end of December 2000, NCAC had entered into the following three separate purchase agreements:

10

(1)    A stock purchase agreement with the SCC shareholders ("SCC SPA") dated December 28, 2000, providing that the SCC shareholders would sell to NCAC all the SCC stock for a purchase price of $117 million, subject to certain adjustments.

(2)    An asset purchase agreement with QNI ("QNI APA") dated December 29, 2000, providing that NCAC would sell SCC's Wisconsin television stations and production company to QNI for $168 million, subject to certain adjustments.

(3)    An asset purchase agreement with TSTT ("TSTT APA") dated December 29, 2000, providing that NCAC would sell the Minnesota television station to TSTT for $3 million.

In the course of negotiating these agreements, SCC and NCAC counsel remained wary of "minimiz[ing]" and "eliminat[ing]" any "linkage issues" between the SCC SPA and the APAs with other entities. *See, e.g.*, Appellee's Corrected Suppl. App. Tab 17 (Ex. 78-J) (suggesting edits to the proposed QNI APA "to eliminate linkage issues with respect to the SPA and APA," and further suggesting that the parties "consider how many references are appropriate to SCC if we are attempting to draft an APA that minimizes linkage issues with SCC"); *id.* Tab 56 (Ex. 331-J) (requesting to receive comments "orally, so as to not create too much of a connection between this document and your client").

On January 19, 2001, the IRS released Notice 2001–16, 2001–1 C.B. 730, clarified by Notice 2008–111, 2008–51 I.R.B. 1299, which identified and described certain transactions as types of an "intermediary transactions tax shelter" and advised that direct or indirect participants of the same or substantially similar

11

transactions would be required to disclose their participation in accordance with 26 C.F.R. § 1.6011–4T(b)(2).[6]  Schmidt sent copies of Notice 2001–16 to the Shockleys and their legal counsel because he believed that the proposed transaction with ICA bore some similarities to the transactions described in the notice.

In early 2001, Ohlrich toured the stations that SCC owned and was introduced to SCC employees as the president of the company that was purchasing

---

[6]     Specifically, Notice 2001-16 provided in relevant part as follows:

The Internal Revenue Service and the Treasury Department have become aware of certain types of transactions, described below, that are being marketed to taxpayers for the avoidance of federal income taxes. The Service and Treasury are issuing this notice to alert taxpayers and their representatives of certain responsibilities that may arise from participation in these transactions.

These transactions generally involve four parties: seller (X) who desires to sell stock of a corporation (T), an intermediary corporation (M), and buyer (Y) who desires to purchase the assets (and not the stock) of T. Pursuant to a plan, the parties undertake the following steps. X purports to sell the stock of T to M. T then purports to sell some or all of its assets to Y. Y claims a basis in the T assets equal to Y's purchase price. Under one version of this transaction, T is included as a member of the affiliated group that includes M, which files a consolidated return, and the group reports losses (or credits) to offset the gain (or tax) resulting from T's sale of assets. In another form of the transaction, M may be an entity that is not subject to tax, and M liquidates T (in a transaction that is not covered by § 337(b)(2) of the Internal Revenue Code or § 1.337(d)–4) of the Income Tax Regulations, resulting in no reported gain on M's sale of T's assets.

Depending on the facts of the particular case, the Service may challenge the purported tax results of these transactions on several grounds, including but not limited to one of the following: (1) M is an agent for X, and consequently for tax purposes T has sold assets while T is still owned by X, (2) M is an agent for Y, and consequently for tax purposes Y has purchased the stock of T from X, or (3) the transaction is otherwise properly recharacterized (e.g., to treat X as having sold assets or to treat T as having sold assets while T is still owned by X). Alternatively, the Service may examine M's consolidated group to determine whether it may properly offset losses (or credits) against the gain (or tax) from the sale of assets.

Notice 2001–16, 2001–1 C.B. 730.

12

SCC.  In addition, NCS Trust applied for a loan of $175 million from Ultrecht–America Finance Co. ("UAFC"), a subsidiary of Coöperatieve Centrale Raiffeisen–Boerenleenbank, B.A. ("Rabobank"), in contemplation of purchasing the SCC stock.  On or around January 23, 2001, NCAC, SCC, QNI, and the newly renamed SB LLC filed applications with the FCC seeking consent for the SCC stock sale, transfer of the television stations, and assignment of broadcast station licenses as required by the parties' respective agreements with one another.

In a letter dated March 29, 2001, Midwest Communications, Inc. ("Midwest"), a Wisconsin corporation, made an offer to purchase the SCC radio assets from NCAC for $7.5 million.  NCAC, through Ohlrich, accepted the offer on March 31, 2001.

On April 5, 2001, ICA's counsel incorporated Shockley Delaware Corp. ("SDC"), which was wholly owned by NCAC.  SDC was created, in part, to hold SCC's assets after the acquisition.  At some point on or after April 27, 2001, ICA's agents formed Northern Communications Holdings Co. ("NC Holdings"), which had the same officer and director as NCAC: Ohlrich.  ICA instructed that NC Holdings was to be created to serve as an intermediate company so that NC Holdings would wholly own NCAC while being wholly owned by NCS Trust.

13

In the midst of this activity, the president of Kalil sent a business letter to Terry, SCC, QNI, and Midwest dated April 16, 2001, referencing a discussion that he had had with Terry regarding Kalil's fee schedule:

> Also, we discussed waiving the fee on the midco expense of $9 million to which I have agreed.
>
> In other words, our exclusive agreement fee schedule is applicable for $162 million on the television station sale and dollar-for-dollar on the radio station sale or a combined $178.5 million less $9 million equaling $169.5 million.

Appellee's Corrected Suppl. App. Tab 57 (Ex. 334-R).  Subsequently, in a business letter to Kalil drafted on May 1, 2001, Terry referenced an attached exhibit A, which showed a "Stock Transaction Fee - ICA ($9,000,000)."[7]  Appellee's Corrected Suppl. App. Tab 37 (Ex. 179-J).

On May 15, 2001, UAFC, which had financed other acquisitions by ICA, approved the loan request made by NCS Trust.  This loan was to take the form of a promissory note up to $175 million made by NCS Trust in favor of Rabobank.  Purportedly, the proceeds of the note would be used to fund NCAC's purchase of SCC's stock.  Besides pledges to be made by NCS Trust, the note would at all times be fully secured by an amount in excess of the borrowed funds as provided by QNI and to be held in an escrow account ("Escrow I")—or, alternatively, QNI

---

[7]    It is unclear whether ICA ever actually received any fee. *See Shockley v. Comm'r*, 109 T.C.M. (CCH) 1579, 2015 WL 3827570, at *17 (2015) (noting that "there are some gaps in the record," including "whether ICA actually received a fee and in what amount").

would provide Rabobank with irrevocable payment instructions for cash held at First Union National Bank ("First Union"). Rabobank expected the loan to be repaid within two days of its being made from the proceeds of the QNI APA, and it expected to receive a transaction fee.

On May 25, 2000, Midwest and NCAC entered into an asset purchase agreement ("Midwest APA") with respect to SCC's radio assets. NCAC, SCC, QNI, and SB LLC received the FCC consents for their broadcast license applications on May 30, 2001. Also on that date, UAFC, NCS Trust, NCAC, the SCC shareholders, and Rabobank entered into an agreement regarding a second escrow account ("Escrow II"), for which Rabobank would serve as the escrow agent. According to the agreement, NCAC would use NCS Trust's loan proceeds to deposit an amount equal to the SPA purchase price into Escrow II, from which the SCC shareholders would subsequently be paid for their stock.

E.
Closing and Results

On May 31, 2001, all closings of the sale of SCC stock and sales of SCC assets took place within a span of less than three hours at one of the law firms representing ICA and NCS Trust.[8] These closings were as follows:

---

[8]    Leading up to and throughout the closing, all parties, including Petitioners, engaged experienced professionals and attorneys to handle complicated portions of the transactions, including negotiations, FCC regulations, and taxation. SCC and the SCC Shareholders were represented in the sale of the SCC stock by three different law firms.

15

(1)   Ohlrich, as trustee of NCS Trust and with respect to its promissory note, instructed UAFC to draw down $130 million and to credit the funds to NCS Trust's Rabobank account. At the same time, Ohlrich authorized UAFC to debit from the same account Rabobank's transaction fee of $750,000. He transferred the remaining $129,250,000 of loan proceeds to NC Holdings in exchange for 100 shares of NC Holdings' preferred stock given to NCS Trust, and he then pledged both NC Holdings' common and preferred stock (held by NCS Trust) to UAFC as additional security for repayment of the loan.

(2)   NC Holdings then gave its $129,250,000 in loan proceeds to NCAC as a contribution to capital. From that contribution, NCAC deposited $96,113,235.68 into Escrow II. In accordance with the SCC SPA and the Escrow II agreement, the SCC shareholders sold all their shares of SCC to NCAC. SCC then became a wholly-owned subsidiary of NCAC, and the Shockleys resigned from their positions in SCC.

(3)   Immediately following the sale of this stock, $94,713,235.68 from Escrow II was transferred to a third escrow account created for the purposes of making disbursements to the (now former) SCC shareholders.

(4)   Next, QNI, NCAC, UAFC, and First Union entered into an agreement with respect to Escrow I, for which First Union served as the escrow agent and QNI and several of its subsidiaries were the guarantors. In accordance with this agreement, QNI caused to be deposited in escrow at least the sum required under the QNI APA for the purchase of the agreed-upon television assets. The agreement further provided that all amounts paid from Escrow I were to be applied to the satisfaction of QNI's obligation to pay the QNI APA purchase price and the obligation to repay the UAFC loan. Finally, the agreement provided that UAFC would be repaid that day, absent any unusual circumstances.

(5)   Thereafter, Ohlrich—who was at that point president of both SDC and SCC—caused SCC to merge with and into SDC. Effectively at the same time, Ohlrich authorized SDC to convert

16

from a corporation to a limited liability company, and thus he formed a new limited liability company under Delaware law named Shockley Communications Acquisition, LLC ("SCA LLC"). SCA LLC immediately admitted an additional member, Hare Street Trading, L.P., an Isle of Man limited partnership, which acquired a 1% membership interest. SCA LLC then purchased the preferred stock subject to the UAFC loan obligation of NCS Trust. As soon as SCA LLC assumed this repayment obligation, UAFC released NCS Trust from its loan obligation. NCAC then merged into NC Holdings, and although NC Holdings was the surviving entity, its name was nevertheless changed to "Northern Communications Acquisition Corp." ("NCAC II").

(6)    Following its formation, SCA LLC sold its newly acquired television assets to QNI and SB LLC in accordance with the QNI APA and the TSTT APA, respectively. A portion of the proceeds from these asset sales was disbursed to UAFC in repayment of the loan, and SCA LLC's obligation under the loan was thus fully discharged.

(7)    Ohlrich, as president of NCAC II, instructed Rabobank to transfer the remaining $33,136,764.32 of the NCAC contribution to capital/loan proceeds to an account for SCA LLC. The FCC broadcast licenses for the radio stations were assigned from SCC to SCA LLC effective May 31, 2001.

Finally, on September 21, 2001, NCAC II/SCA LLC sold the radio assets to Midwest in accordance with the Midwest APA.[9]

---

[9]    From May 31, 2001, through September 20, 2001, SCA LLC remained responsible for controlling the programming, the employees, and the financial expenditures of the radio stations. SCA LLC was also the FCC licensee at risk for any violations of FCC rules.

17

As a result of all the foregoing transactions, SCC's appreciated assets were sold without generating any correlating tax liability to SCC, SDC, SCA LLC, NCAC II, ICA, the SCC shareholders, or anyone else.[10]

In exchange for their SCC shares, Terry, Sandra, and Shockley Holdings ultimately received $10,975,059.03, $11,244,084.42, and $4,053,709.13, respectively.  Petitioners timely filed federal income tax returns for calendar year 2001 reporting gains from the May 31, 2001, sale of SCC stock.

### F.
### Tax Consequences

On or about February 24, 2002, the IRS received SCC's Form 1120, U.S. Corporation Income Tax Return, for its short tax year of January 1 through May 31, 2001.  This form, which was prepared by ICA's Chief Financial Officer, reported that SCC had zero assets by the end of its 2001 tax year and zero tax due. It further reported that, on May 31, 2001, SCC had merged into SDC, and immediately thereafter, SDC converted into a Delaware limited liability company. This merger and conversion resulted in SCC's liquidation and tax-free distribution under I.R.C. § 332.

---

[10]    This was the basic bottom line of an opinion letter issued on May 31, 2001, describing the events that transpired that day and their expected tax consequences. *See Shockley*, 2015 WL 3827570, at *8-9 (quoting the relevant text of the opinion letter).  This letter was prepared by a law firm representing NCS Trust at the requests of NCS Trust, NC Holdings, NCAC II, SCC, SDC, and SCA LLC.

18

On February 18, 2005, the IRS issued multiple notices of deficiency relating to SCC's short tax year ended May 31, 2001.[11]  On September 6, 2007, the IRS assessed the following amounts against SCC for the tax year ending May 31, 2001: (1) corporate income tax of $41,566,515; (2) an addition to tax under I.R.C. § 6651(a)(1) of $2,078,276; (3) an accuracy-related penalty under I.R.C. § 6662 of $8,313,303; and (4) interest of $26,953,309.60.  Thereafter, the IRS undertook transferee examinations of eight of the largest SCC shareholders who sold their SCC shares to NCAC on May 31, 2001, including Petitioners.  The IRS sent Petitioners notice of transferee liability statements on August 21, 2008.

On November 19, 2008, Petitioners each filed separate Tax Court petitions contesting the IRS's determination that they were liable as transferees for SCC's corporate income tax liabilities.  The Tax Court consolidated all three cases and tried them from January 19, 2010, through January 22, 2010.  Initially, the Tax

---

[11]    On May 25, 2005, the Shockleys filed a petition at docket no. 9700-05 in the United States Tax Court in response to a deficiency notice they received at what was then their home address in Madison, Wisconsin.  This notice determined a deficiency of $9,868,051 and a penalty of $1,973,610.20 with respect to the Shockleys' jointly filed 2001 individual income tax return.  The parties ultimately agreed to settle the case with no deficiency or penalty due, and a stipulated decision to this effect was entered in docket no. 9700-05 on August 23, 2007.

Also on May 25, 2005, a petition was filed at docket no. 9699-05 in the United States Tax Court.  This petition stated that it was "filed on behalf of Petitioner subject to the invalidity of the Notice of Deficiency and the failure to properly serve the corporation as required by statute.  Without conceding the jurisdiction of this Court, the Petitioner hereby submits this Limited and Special Petition."  This case was dismissed for lack of jurisdiction on April 26, 2007, on the basis that SCC lacked legal capacity to proceed through the Shockleys.  The order of dismissal stated that the parties had agreed that the case should be dismissed on this ground, and therefore the Court did not need to determine the validity of the notice of deficiency.

19

Court held that the limitations period for the IRS to assess transferee liability had expired, and it entered decisions in favor of the Shockleys on that basis on May 2, 2011. *See Shockley v. Comm'r*, 101 T.C.M. (CCH) 1451, 2011 WL 1641884, at *9 (2011). The Commissioner appealed, however, and the Eleventh Circuit reversed and remanded to the Tax Court. *See Shockley v. Comm'r*, 686 F.3d 1228, 1239 (11th Cir. 2012). The Tax Court then issued a supplemental opinion on June 22, 2015, holding the Shockleys liable as transferees of SCC. *See Shockley v. Comm'r*, 109 T.C.M. (CCH) 1579, 2015 WL 3827570, at *20 (2015).[12]

On March 18, 2016, the Tax Court entered its final decisions in the three consolidated cases, holding Petitioners liable as transferees of SCC. Terry was held liable for $10,975,059.00, plus interest. Sandra was held liable for $11,244,084.00, plus interest. Shockley Holdings was held liable for $4,053,709.00, plus interest. Petitioners timely appealed.

## II.

Whether the Tax Court properly characterized a particular transaction for federal tax purposes is a question of law subject to *de novo* review. *See Frank Lyon Co. v. United States*, 435 U.S. 561, 581 n.16 (1978); *Winn-Dixie Stores, Inc.*

---

[12] On August 6, 2015, Petitioners filed a motion for reconsideration, and on January 11, 2016, following additional briefing by the parties, the Tax Court issued a second supplemental opinion to clarify that Petitioners were liable for pre-notice interest (*i.e.*, for periods prior to the issuance of the notices of transferee liability) as determined by Wisconsin law, and also for post-notice interest as determined by the Internal Revenue Code. *See Shockley v. Comm'r*, 111 T.C.M. (CCH) 1038, 2016 WL 145818, at *6 (2016). The Tax Court's second supplemental opinion does not address any of the issues raised in the present appeal.

*v. Comm'r*, 254 F.3d 1313, 1315 (11th Cir. 2001).  The Tax Court's application of state law is also subject to *de novo* review.  *L.V. Castle Inv. Grp., Inc. v. Comm'r*, 465 F.3d 1243, 1245 (11th Cir. 2006); *see also Pugh v. Comm'r*, 213 F.3d 1324, 1325 (11th Cir. 2000) ("We have jurisdiction to review the decisions of the Tax Court 'in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury.'" (quoting 26 U.S.C. § 7482(a)(1))).

## A.
### Applicable Law

Generally, taxpayers have the right to minimize or avoid their taxes by any means permitted by law. *See Gregory v. Helvering*, 293 U.S. 465, 469 (1935). This right, however, "does not bestow upon the taxpayer the right to structure a paper entity to avoid tax when that entity does not stand on the solid foundation of economic reality." *Markosian v. Comm'r*, 73 T.C. 1235, 1241 (1980).  Although courts typically "respect the form of a transaction," they will, when warranted, "use substance over form and its related judicial doctrines to determine the true nature of a transaction disguised by formalisms that exist solely to alter tax liabilities." *John Hancock Life Ins. Co. (U.S.A.) v. Comm'r*, 141 T.C. 1, 57 (2013); *see also Markosian*, 73 T.C. at 1241 ("When the form of the transaction has not, in fact, altered any cognizable economic relationships, we will look[ ] through that form and apply the tax law according to the substance of the transaction.").

21

To determine the true nature of a transaction under federal tax principles, courts rely primarily on three distinct but similar doctrines. The first of these, known as the "substance over form" doctrine, allows courts to "look to the objective economic realities of a transaction rather than to the particular form the parties employed" in deciding how to treat a particular transaction for tax purposes. *Frank Lyon Co.*, 435 U.S. at 573. The "business purpose" doctrine applies when "an operation [had] no business or corporate purpose," but was "a mere device which put on the form of a corporate reorganization as a disguise for concealing its real character." *Gregory*, 293 U.S. at 469. Finally, the "economic substance" doctrine asks whether a transaction "changes in a meaningful way . . . the taxpayer's economic position," and whether "the taxpayer has a substantial purpose (apart from Federal income tax effects)" for entering into it. I.R.C. § 7701(o).

Once a transaction has been recast under any of these principles, a party may qualify as a transferee under § 6901 of the Internal Revenue Code. Section 6901 provides that the liability of a transferee of property of a taxpayer owing federal income tax "shall . . . be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred." I.R.C. § 6901(a). "Transferee" is defined broadly to include any "donee, heir, legatee, devisee, and distributee, and

22

with respect to estate taxes, also includes any person who, under section 6324(a)(2), is personally liable for any part of such tax."  I.R.C. § 6901(h).

Importantly, § 6901 does not independently impose tax liability on a transferee; instead, it provides only a procedure by which the IRS may collect unpaid taxes owed by a transferor of assets from the transferee who received those assets.  *See Comm'r v. Stern*, 357 U.S. 39, 43-45 (1958) ("[Section 6901] neither creates nor defines a substantive liability but provides merely a new procedure by which the Government may collect taxes. . . . [W]e hold that, until Congress speaks to the contrary, the existence and extent of liability should be determined by state law.").  Accordingly, the Commissioner must have an independent basis for liability before collecting taxes under § 6901—or, in other words, transferee status under federal law must be determined independently of substantive liability for fraudulent transfer under state law.  *See id.*; *see also Feldman v. Comm'r*, 779 F.3d 448, 459 (7th Cir. 2015) (collecting cases supporting the proposition that "[e]very circuit that has addressed [the] question has . . . required independent determinations of transferee status under federal law and substantive liability under state law").[13]

---

[13]    Regarding the order in which these inquiries are undertaken, the parties do not dispute on this appeal that a court "can start with either part, and the Commissioner must pass both to win." *Buckrey v. Comm'r*, 114 T.C.M. (CCH) 45, 2017 WL 2964716, at *8 (2017) (citing *Slone v. Comm'r*, 810 F.3d 599, 608 (9th Cir. 2015); *Diebold Found., Inc. v. Comm'r*, 736 F.3d 172, 185–86 (2d Cir. 2013); *Starnes v. Comm'r*, 680 F.3d 417, 427 (4th Cir. 2012)).

The parties do not dispute that the applicable state fraudulent transfer law that could provide a basis for substantive liability in this case is the Wisconsin Uniform Fraudulent Transfer Act ("WIUFTA").[14]  This statute provides in relevant part as follows:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Wis. Stat. Ann. § 242.05(1).  The WIUFTA defines "transfer" broadly as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease and creation of a lien or other encumbrance."  *Id.* § 242.01(12).

The highest state court in Wisconsin has characterized Wis. Stat. Ann. § 242.05(1) as comprising three elements of fraudulent transfer: "(1) the creditor's claim arose before the transfer was made; (2) the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer; and (3) the debtor either was insolvent at the time of the transfer or became insolvent as a

[14]    Wisconsin law applies because the transactions in question took place in Wisconsin.  This Court has jurisdiction to review the Tax Court's decision under I.R.C. § 7481, and venue is appropriate for this appeal under I.R.C. § 7482 because the Shockleys resided in Florida and Shockley Holdings had its principal place of business in Florida at the time the parties filed their Tax Court petitions.

24

result of the transfer." *Badger State Bank v. Taylor*, 688 N.W.2d 439, 442 (Wis. 2004). Creditors, including the Commissioner, have the burden to prove all three elements of transferee liability under the WIUFTA "by clear and convincing evidence." *In re Loyal Cheese Co.*, 969 F.2d 515, 518 (7th Cir. 1992) (citing *Kerbet v. Behling*, 61 N.W.2d 205, 207 (Wis. 1953)).

Further, the Wisconsin Supreme Court has explained that the WIUFTA is a creditor-protection statute, and any transfer therefore must be viewed from the perspective of a creditor. *See Badger State Bank*, 688 N.W.2d at 449. Moreover, Wis. Stat. Ann. § 242.05(1) is a "'constructive fraud' provision" constituting a "per se rule" under which good faith (or lack thereof) is irrelevant. *See id.* at 447. For these reasons, "[a] transferee's subjective state of mind does not play a role in resolving [a] case under Wis. Stat. Ann. § 242.05(1)." *Id.* at 449.

Prior to the remand in this case, the Court of Appeals for the Seventh Circuit issued the first decision in any court—state or federal—directly addressing transferee liability under the WIUFTA. *See Feldman*, 779 F.3d at 450.[15] The facts of *Feldman* involved the former shareholders of a closely held Wisconsin corporation that had operated a dude ranch in northwestern Wisconsin for several decades. *Id.* Following the sale of the dude ranch, the former shareholders of the corporation engaged in "an intricate tax-avoidance transaction" involving an

---

[15] Knowing that this decision was pending, the Tax Court specifically deferred issuing its opinion in the instant case until after the Seventh Circuit issued its opinion in *Feldman*.

intermediary company called MidCoast that served to "effectively liquidat[e] the corporation without absorbing the financial consequences of the tax liability." *Id.* The IRS later sought to hold the former shareholders liable for the unpaid taxes as transferees under § 6901 and the WIUFTA. *See id.*

On appeal, the Seventh Circuit agreed with the Tax Court's conclusion that the shareholders' transaction bore "the hallmarks of a de facto liquidation," and it therefore disregarded the form of the transaction to hold the shareholders liable as transferees under § 6901. *Id.* at 457. The Seventh Circuit then proceeded to make the following holdings:

(1)    "[S]tate fraudulent-transfer law is . . . flexible and looks to equitable principles like 'substance over form,' just like the federal tax doctrines," *id.* at 459;

(2)    "[T]he independent state-law inquiry will make a difference in outcome only when there is a conflict between the applicable federal tax doctrine and the state law that determines substantive liability"—and "no such conflict" exists between the WIUFTA and § 6901, *id.* at 458; and

(3)    The shareholders' "due diligence and lack of knowledge of illegality is simply beside the point" because "subjective intent and good faith play no role in the application of the constructive-fraud provisions of Wisconsin's UFTA," *id.* at 459–60.

Applying these holdings, the Seventh Circuit deemed the shareholders transferees under both state and federal laws, and affirmed the Tax Court's decision upholding

26

the Commissioner's assessment of transferee liability against the shareholders for

the dissolved corporation's unpaid taxes and penalties. *Id.* at 459-61.

## B.
## Decision Below

At the outset of its analysis, the Tax Court characterized the transaction at

issue as a Midco transaction that "allow[ed] the parties to have it both ways" by

"letting the seller engage in a stock sale and the buyer engage in an asset sale":[16]

> While the Shockleys testified that neither they nor SCC ever hired
> ICA, the SCC board nevertheless made a decision in September 2000
> to sell SCC's stock to an affiliate of ICA. No ICA "affiliate" existed
> to hire ICA at that time; thus the SCC board agreed, tacitly or
> otherwise, to permit ICA to act as an intermediary of a "buy SCC
> stock/sell SCC assets" transaction. The SCC board wanted ICA's
> services because the SCC shareholders could avoid the unwanted tax
> results of an appreciated asset sale and enjoy the sought-after tax
> savings of a stock sale—something it was unable to obtain before

---

[16]     The Tax Court relied on the definition of this type of transaction provided in the leading Second Circuit case interpreting New York's fraudulent conveyance statute:

> In such a transaction, the selling shareholders sell their C Corp stock to an
> intermediary entity (or "Midco") at a purchase price that does not discount for the
> built-in gain tax liability, as a stock sale to the ultimate purchaser would. The
> Midco then sells the assets of the C Corp to the buyer, who gets a purchase price
> basis in the assets. The Midco keeps the difference between the asset sale price
> and the stock purchase price as its fee. The Midco's willingness to allow both
> buyer and seller to avoid the tax consequences inherent in holding appreciated
> assets in a C Corp is based on a claimed tax-exempt status or supposed tax
> attributes, such as losses, that allow it to absorb the built-in gain tax liability. If
> these tax attributes of the Midco prove to be artificial, then the tax liability created
> by the built-in gain on the sold assets still needs to be paid. In many instances,
> the Midco is a newly formed entity created for the sole purpose of facilitating
> such a transaction, without other income or assets and thus likely to be judgment-
> proof. The IRS must then seek payment from the other parties involved in the
> transaction in order to satisfy the tax liability the transaction was created to avoid.

*Diebold Found., Inc. v. Comm'r*, 736 F.3d 172, 175-76 (2d Cir. 2013) (citation omitted).

27

> working with ICA.  Over two months after the SCC board's decision, ICA created the stock purchaser, NCAC, which appears to have had no initial assets or any income-producing purpose of its own and was capitalized by ICA only when its lack of finances was questioned by the SCC board.
>
> ICA also generated other shell entities: NCA LLC, NCS Trust, NC Holdings, SDC, and SCA LLC, as well as NC Fund to fund the unfunded NCAC.  ICA then used this labyrinthine array to bring about a three-hour program of reorganizations, name changes, and restructurings, all for the ultimate result of a two-member LLC (one member being an Isle of Man entity) that was created for no other explained reason than to avoid the tax consequences of the sales of SCC's assets.

*Shockley*, 2015 WL 3827570, at *14-15 (quoting *Diebold Found.*, 736 F.3d at 175).  Following an extensive analysis of this scheme, the Tax Court ultimately concluded that, "looking to the objective economic realities of the transaction, the evidence and reasonable inferences therefrom sufficiently establish that the true substance of the transaction is different from its form—that the only purpose of the ICA Midco transaction was tax avoidance." *Id.* at *17 (citing *Frank Lyon Co.*, 435 U.S. at 573; *Harris v. Comm'r*, 61 T.C. 770, 783 (1974)).  On the basis that "the overall Midco transaction was a sham because it was not a true multiple-party transaction, lacked economic substance, had no business purpose, and was only entered to avoid tax," the Tax Court disregarded the form of the transaction and held Petitioners liable as transferees under § 6901. *Id.* at *20.

The Tax Court then found separately that the transaction was fraudulent under the WIUFTA.  Although the sale of SCC's stock occurred "an hour or two"

28

before the sale of its assets, the Tax Court nevertheless deemed the sale of SCC's

television and radio assets "taxable events that fall within the definition of a claim

under WIUFTA" because "[l]ogically, these deemed sales would have had to occur

before SCC's being theoretically able to distribute/transfer the resulting proceeds

to [P]etitioners."  *Id.*  Further, the Tax Court found as a matter of fact that SCC did

not receive "reasonably equivalent value" within the meaning of the WIUFTA

because Petitioners "received distributions of approximately $26 million (not

including loan repayments) from the proceeds of the sales of SCC's assets while

SCC received nothing (or, at best, received petitioners' shares of SCC stock,

which—because of the distributions essentially liquidating SCC—were

worthless)."  *Id.* at *21.  Finally, with regard to insolvency, the Tax Court

concluded as follows:

> [T]he tax on the sales of the assets was a debt to SCC as of the date of
> sale, May 31, 2001.  That tax debt would have been approximately
> $39,488,189.  (We arrive at this amount by attributing 95% of the
> deficiency of $41,566,515 to the television assets that accounted for
> approximately 95% of SCC's total assets.  While $39,488,189 may
> not be the actual amount of tax owed on the sales of the televis[i]on
> assets, it is close enough to illustrate SCC's economic status.)  For our
> purposes, the approximate fair market value of SCC's remaining
> assets after the May 31, 2001, sales, i.e., the radio assets, is considered
> to be their purchase price of $7.5 million.  As a result, SCC's tax debt
> was significantly greater than its remaining assets as of May 31, 2001.
> When SCC sold its remaining assets in September 2001, it would have
> continued to be insolvent pursuant to section 242.02(2) of the
> Wisconsin Statutes.

*Id.* at *22.

29

C.

Discussion

On appeal, Petitioners argue that "the Tax Court misapplied the substance over form doctrine in five key ways":

(1)    By "disregarding the economic effects of the stock sale on the parties to the transaction and instead requiring that the stock sale provide an economic benefit to the corporation whose stock was sold";

(2)    By "finding that the shareholders' legitimate non-tax business purposes for selling their stock were irrelevant because there was insufficient evidence that the corporation shared those purposes";

(3)    By "refusing to acknowledge as legitimate any business purpose that was not free of tax considerations";

(4)    By "attributing a tax-avoidance purpose to the stock sale based solely on subsequent transactions conducted by the stock purchaser without the selling shareholders' involvement or knowledge"; and

(5)    By "determining that a transaction in which numerous unrelated shareholders sold their stock to an unrelated purchaser using funds borrowed from an independent banking institution was not a bona fide multiple party transaction."

Appellants' Br. 21.  Petitioners argue further that Wisconsin law does not allow a litigant to use substance-over-form theories to "invent every element required by the constructive fraud provisions of the WIUFTA, including both the transfer to the alleged transferee and the claim at the heart of the debtor/creditor relationship,

30

regardless of the alleged transferees' good faith and lack of knowledge that there would be an unpaid liability." *Id.* at 22.

## 1.
### *Transferee Liability Under § 6901*

Whether couched in terms of "substance over form," the "business purpose" doctrine, or the "economic effects" test, we are unpersuaded by Petitioners' arguments that the Tax Court improperly chose to recast the SCC stock sale as an asset sale followed by a liquidating distribution. Had Petitioners simply chosen to sell their stock in a straightforward fashion, they could not be faulted for that choice even if it had been based solely on superior tax efficiency. Instead, however, the Shockleys chose an extraordinarily abstruse route. Nowhere does the record reflect any legitimate business purpose or economic effects that satisfactorily explain why Petitioners undertook the Midco transaction that occurred in this case, nor why the substance of this transaction should be disregarded in favor of its perplexing form.

Petitioners admit that "avoiding corporate tax on built-in gains was certainly a factor in the decision not to sell SCC's assets." Appellants' Br. 37–38. Aside from this tax avoidance purpose, we see no convincing justification for the Petitioners having entered a "buy stock/sell assets" transaction of precisely the sort described in Notice 2001-16. Insofar as Petitioners seek to characterize SCC as a "going concern" at the time of the stock sale, we agree with the Tax Court that "the

31

overall transaction nullified SCC as a 'going concern' by having it merged out of existence." *Shockley*, 2015 WL 3827570, at *19. Similarly, to the extent that Petitioners claim their non-tax reason for undertaking a Midco transaction was the desire to avoid a piecemeal sale of SCC, we agree with the Tax Court that the Midco transaction produced precisely this result: the sale of SCC's radio assets did not occur until nearly four months after the sale of its television assets, and SCC's collective television and radio assets were ultimately distributed to three different buyers. *See id.* ("If the SCC board was concerned about the 'breaking up' of SCC, however, it nevertheless submitted to the overall transaction with the knowledge that this exact result would occur.").

Moreover, Petitioners' contention that they "engaged in one transaction—the sale of their SCC stock to NCAC for cash" is disingenuous at best. *See* Appellants' Br. 33. In direct contravention of Petitioners' claim that NCAC undertook all actions subsequent to the stock sale "without the Shockleys' involvement or knowledge," the record plainly reveals the Shockleys' awareness that the SCC stock sale was only one piece of a very intricate puzzle. As early as August 2000, the Shockleys were informed of the risk that the IRS might recharacterize the transaction as an asset sale—and this is a warning they presumably would have understood, given Kalil's earlier written communication encouraging Terry to consider not a straightforward stock sale, but instead a "buy

32

stock/sell assets" involving an intermediary company's "ownership" of SCC "for about one hour."  Appellee's Corrected Suppl. App. Tab 7 (Ex. 27-J). Additionally, communications among counsel in the fall of 2000 explicitly express a desire to "minimize[]" or "eliminate" any "linkage issues" between the stock purchase agreement and the asset purchase agreements, thereby suggesting that these agreements were, in fact, linked.  *Id.* at Tab 17 (Ex. 78-J).

Even if all of this went over the Shockleys' heads, they must have understood that they were undertaking more than a straightforward stock sale by the time Terry told QNI in writing that SCC had a "'Midco' company arrangement standing by to proceed," and that "the Midco purchase of SCC stock and the Midco sale of the TV assets to QNI can proceed simultaneously . . . ."  Appellee's Corrected Suppl. App. Tab 58 (Ex. 349-J).  And, of course, the closing of the asset sales to QNI and TSTT took place not only within the same three-hour span as the stock sale to NCAC, but also at one of the law firms representing ICA and NCS Trust.  These uncontested facts wholly undermine Petitioners' claim that they knew nothing about the transaction other than that NCAC would purchase SCC stock for cash.

Similarly, although Petitioners argue that the Tax Court made no finding that "ICA, NCAC, Roger Ohlrich or any of the other individuals or entities affiliated with the stock purchaser were related in any way to any of the 29 selling

33

shareholders or to the bank that made the loan for the purchase price," the parties do not dispute the Tax Court's findings that the stock purchaser, NCAC, (1) had no initial assets or any income-producing purpose of its own, (2) was not created until the SCC Board decided to pursue a stock sale, and (3) was not capitalized by ICA until the SCC Board questioned its lack of financing. *See Shockley*, 2015 WL 3827570, at *15. Nor do the parties dispute that Ohlrich held all of the following positions (and many of them simultaneously): (1) agent of ICA; (2) president, chairman, and sole member of the board of directors of NCAC; (3) trustee of NCS Trust; (4) sole officer and director of NC Holdings; and (5) president of NCAC II. None of these undisputed facts accord with Petitioners' claim that "the stock sale was an arms-length transaction between unrelated parties." Appellants' Br. 35.

At bottom, we agree with the Tax Court that Petitioners entered into the overall transaction solely for tax avoidance purposes. Although we "cannot ignore the reality that the tax laws affect the shape of nearly every business transaction," *Frank Lyon Co.*, 435 U.S. at 580, we nevertheless apply tax law according to the substance of the transaction when its form "has not, in fact, altered any cognizable economic relationships," *Markosian*, 73 T.C. at 1241. Seeing no adequate non-tax justification for the "labyrinthine array" of transactions between numerous shell entities immediately following the sale of SCC stock to NCAC, and given that the ultimate result of these transactions was nothing more than a two-member LLC

34

(one member of which was an Isle of Man entity), we find that the Tax Court appropriately "use[d] substance over form and its related judicial doctrines to determine the true nature of a transaction disguised by formalisms that exist solely to alter tax liabilities." *John Hancock Life Ins. Co.*, 141 T.C. at 57.

2.
*Liability Under State Fraudulent Transfer Law*

With respect to substantive liability under state law, Petitioners argue that the Tax Court erroneously conflated "two separate and distinct tests" by applying state fraudulent transfer law to a transaction already recast under federal law. Appellants' Br. 40.  Petitioners take the position that Wisconsin courts have not yet determined "whether or under what circumstances a court could recast a transaction to create a transfer that did not actually occur for purposes of the WIUFTA," and the only available guidance "strongly indicates that Wisconsin law would respect corporate form and not recast a stock sale as an asset sale before applying the WIUFTA."  *Id.* at 43.  In particular, Petitioners rely on *Badger State Bank* to argue that "[i]f creditors were given license to recast a transaction to create the requirements of Section 242.05(1), the statutorily defined class of transfers would expand exponentially beyond the intent of the drafters and would no longer constitute an objective per se rule."  *Id.* at 45–46.

The Commissioner agrees that "no Wisconsin court has addressed this issue in the context of WIUFTA."  Appellee's Br 33.  Like the Tax Court, however, the

35

Commissioner relies on the Seventh Circuit's recent decision in *Feldman* to support the conclusion that Wisconsin courts would apply substance-over-form principles to cases involving the WIUFTA.

We agree with the Commissioner, the Tax Court, and the Seventh Circuit that substance-over-form analysis is appropriate in context of the WIUFTA. The Wisconsin Supreme Court recognized in *Badger State Bank* that "[t]he Uniform Fraudulent Transfer Act reflects a strong desire to protect creditors," and "[b]oth the language of [WIUFTA] and the policies motivating the Uniform Fraudulent Transfer Act are couched in terms of creditor protection." *Badger State Bank*, 688 N.W.2d at 448. Without the power to look through the form of a transaction to its substance, this statutory purpose would be severely impeded. Furthermore, and as the Seventh Circuit noted in *Feldman*, the Wisconsin state courts are no strangers to the substance-over-form doctrine. *See Feldman*, 779 F.3d at 459 (collecting cases in which the Wisconsin courts have employed a substance-over-form analysis in "a variety of contexts, most notably including tax cases").

More importantly, we disagree with Petitioners' assertion that the Tax Court "rel[ied] on the federal tax substance over form doctrines to recast the Shockley's sale of their SCC stock as an asset sale followed by a liquidating distribution for purposes of applying state fraudulent transfer law." Appellants' Br. 41. Such an action would, as Petitioners suggest, inappropriately conflate the independent

36

inquiries regarding transferee status under § 6901 and substantive liability under state law. *See Stern*, 357 U.S. at 43–45. Instead, we agree with the Commissioner that the Tax Court in this case "simply followed *Feldman*'s teaching that the substance-over-form analysis under Wisconsin fraudulent-transfer law is substantially the same as the substance-over-form analysis under federal tax law." Appellee's Br. 46; *see also Feldman*, 779 F.3d at 458 (holding that "the independent state-law inquiry will make a difference in the outcome only when there is a conflict between the applicable federal tax doctrine and the state law that determines substantive liability"—and "no such conflict" exists between the WIUFTA and § 6901). Given the similarly broad definitions of "transfer" under § 6901 and the WIUFTA, the creditor-protection goals motivating the WIUFTA, and a dearth of case law suggesting any meaningful difference between substance-over-form analysis under federal law and substance-over-form analysis under Wisconsin state law, the Tax Court was not wrong to have followed this teaching.[17]

---

[17]    In a slightly different twist, Petitioners argue that it was error for the Tax Court to have recast the transaction at issue without proof that the alleged transferees entered into the transaction in bad faith. The gist of their argument is that, insofar as a Wisconsin court might recast a transaction at all, it would not interpret its UFTA contrary to analogous laws in other states that have adopted the UFTA or UFCA. Citing cases from the First, Second, Fourth, and Ninth Circuits, Petitioners argue that nearly all circuits to have considered the question have held that, "in order to recast a transaction or series of transactions under UFTA or UFCA, the Commissioner must prove that the selling shareholders acted in bad faith, knew or should have known of the entire scheme implemented by the purchaser, or knew or should have known that the corporation would have a tax liability that would go unpaid." Appellants' Br. 49.

In response, the Commissioner directs our attention to *Weintraut v. Commissioner*, 112 T.C.M. (CCH) 122, 2016 WL 4040793 (2016), a recent decision in which the Tax Court noted

37

Moving to the Tax Court's application of the substance-over-form doctrine to impose substantive liability under the WIUFTA, the primary issue in dispute on appeal is the third requirement outlined in *Badger State Bank*—that is, the insolvency requirement.[18]  *See Badger State Bank*, 688 N.W.2d at 442 (requiring, to establish liability for fraudulent transfer under the WIUFTA, that "the debtor either was insolvent at the time of the transfer or became insolvent as a result of the transfer.").  With respect to this requirement, Petitioners argue that, even assuming the transaction is recast under both federal and state laws, the Tax Court

that, although certain courts have imposed a knowledge requirement under their respective versions of the UFTA, "none of the cases imposing the knowledge requirement involved the Indiana UFTA," nor have they "involve[d] the Wisconsin UFTA."  *Id.* at \*65 & n.129.  Citing *Feldman* and *Badger State Bank* with approval, the Tax Court in *Weintraut* concluded that "the Indiana Supreme Court will not impose, and . . . the Court of Appeals for the Seventh Circuit will hold that the Indiana Supreme Court will not impose[] the knowledge requirement before using Indiana substance over form principles" to determine transferee liability under the Indiana UFTA.  *Id.* at \*72.

We need not decide here whether the Seventh Circuit in *Feldman* properly eschewed any knowledge requirement from the WIUFTA, or whether the Tax Court properly interpreted *Feldman* in *Weintraut*.  Even assuming for the sake of argument that the statute does contain a knowledge requirement, we find ample support on this record supporting an inference that Petitioners were aware of both the nature and risks of the Midco transaction they pursued.

[18]  Petitioners do not dispute that a corporation making liquidating distributions to its shareholders receives nothing of value in exchange for those distributions, thereby satisfying the second requirement of *Badger State Bank* that "the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer."  *Badger State Bank*, 688 N.W.2d at 442.  Furthermore, Petitioners do not dispute that, insofar as the IRS's tax claims against SCC relate back to the asset sales that are deemed to have preceded the corresponding liquidating distributions, the requirement that "the creditor's claim arose before the transfer was made" is also satisfied.  *Id.*  Any arguments Petitioners raise to the contrary—particularly, that the IRS was "not a creditor of SCC at the time the Shockleys sold their stock"—depend on respecting the form of the transaction rather than its substance, which we decline to do for reasons we have already explained.

"misapplied the insolvency tests to the debtor in the transactions it invented."[19]

Appellants' Br. 64.

Petitioners approach their insolvency argument from two angles: they first focus on what *came in* to SCC/SCA on the May 31, 2001, closing date, and then they shift to what allegedly *remained* in SCC/SCA by the end of that day. Their basic argument as to what came in to SCC/SCA is as follows:

(1)    On May 31, 2001, SCC sold its television assets for $171 million and transferred $94,713,235.68 into escrow for distribution to the SCC shareholders.

(2)    This transaction left $83,786,764.00 in cash plus approximately $7.5 million in radio assets in SCC, totaling $91,286,764.00.

(3)    SCC did not have debts in excess of $91,286,764.00 as of May 31, 2001, and therefore it could not have been insolvent.

*See* Appellants' Br. 67.

The Commissioner identifies certain flaws in this argument, including double-counting the $7.5 million in radio assets and the critical omission of a $45,564,539.73 debt that SCC owed to Finova Capital Corporation as of May 31, 2001. Accounting for these facts, the Commissioner contends that SCC/SCA had only $83,786,764.00 following the May 31, 2001 closings (*i.e.*, $171 million + $7.5 million - $94,713,236)—which is less than the $85,052,728.73 sum of its

---

[19]    At the threshold, we note that Petitioners waived their right to pursue this argument on appeal by failing to raise it until they filed their motion for reconsideration in the Tax Court. *See Thomas v. Bryant*, 614 F.3d 1288, 1305 (11th Cir. 2010). In any event, however, the argument has no merit.

debts as of that date (*i.e.*, $45,564,539.73 owed to Finova Capital Corporation +
$39,488,189 in federal income tax liability arising from the television-assets sale).

From the perspective of what *remained* in SCC/SCA by the end of May 31,
2001, Petitioners claim that SCC/SCA had total assets valuing $40,636,764 (*i.e.*,
$33,136,764 from Rabobank loan proceeds + $7.5 million in radio assets), but tax
liability of only $39,488,189.[20]  *See* Appellants' Br. 69.  The Commissioner, on the
other hand, points to exhibits revealing that SCA made at least ten post-closing
disbursements totaling $7,450,366.45.  *See* Appellee's Br. 56 (citing Exs. 270-J
through 273-J).  Additionally, the Commissioner disputes the $33,136,764 cash
figure on the basis that "the parties stipulated that SCA wired a total of
$2,870,723.11 *out* of [the relevant] account on May 31."  *Id.* at 57 (citing Doc. 24
¶ 362; Ex. 264-J).  Accordingly—and even ignoring the fact that "a large portion
of the remaining $30,266,041 in the SCA account ($33,136,764 - $2,870,723) was
used to repay the Rabobank loan, also on May 31"—SCA's assets were less than
its estimated tax liability of $39,488,189.

---

[20]    This estimate of SCC's federal income tax liability comes from the Tax Court, *see*
*Shockley*, 2015 WL 3827570, at *22 (arriving at this amount "by attributing 95% of the
deficiency of $41,566,515 to the television assets that accounted for approximately 95% of
SCC's total assets"), and is used by both parties in the respective calculations they advance on
appeal.  Although Petitioners complain that "[t]he Tax Court simply had no evidence from which
it could accurately determine the amount of the tax liability that allegedly arose as a result of the
sale of SCC's television assets on May 31, 2001," Reply Br. 31, they bear the burden of proving
that the Commissioner incorrectly calculated or assessed SCC's tax liability and have offered no
arguments or alternative figures in this regard.  *See* I.R.C. § 6902(a); Tax Court Rule 142.

We see no error in the Commissioner's reasoning or in the Tax Court's insolvency assessment, and thus we find that the record supports the Tax Court's conclusion that Petitioners qualify as transferees under section 242.05(1) of the Wisconsin Statutes.  SCC received nothing of "reasonably equivalent value" in exchange for the proceeds from the sale of its assets, given that the distributions essentially liquidating the company rendered its stock worthless.  The Commissioner's claims against Petitioners arose before the transfers were made. *See Swinks v. Comm'r*, 51 T.C. 13, 17 (1968)  ("A transferee is liable retroactively for the transferor's taxes and additions to the tax in the year of the transferor to the extent of assets received from the transferor, even though the tax liability of the transferor was unknown at the time of the transfer.").  Finally, the transfers caused SCC to become insolvent, meaning that its liabilities exceeded its assets.  In light of ample evidence supporting these findings, we uphold the Tax Court's determination that Petitioners are substantively liable for fraudulent transfer under applicable state law.

### III.

In summary, we find that the Tax Court appropriately disregarded the Midco transaction and therefore deemed SCC to have transferred the proceeds of its highly appreciated assets to its shareholders, including Petitioners.  Recasting the transaction in this manner renders Petitioners liable as transferees pursuant to

41

federal tax principles, and it also renders them substantively liable under Wisconsin state fraudulent transfer law for the taxes generated by the built-in gain on the appreciated assets that SCC sold.  Under these circumstances, the Commissioner was permitted to assess transferee liability for these unpaid taxes against Petitioners by applying the procedural device supplied by I.R.C. § 6901. For these reasons, the decisions of the United States Tax Court are **AFFIRMED**.