COURT OF APPEALS
DECISION
DATED AND FILED

October 21, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.     **2020AP806**

**STATE OF WISCONSIN**

Cir. Ct. No.  2009CV4165

**IN COURT OF APPEALS
DISTRICT IV**

---

ALLSOP VENTURE PARTNERS III, ALTA V. LIMITED PARTNERSHIP,
ALTA SUBORDINATED DEBT PARTNERS III LP
AND STATE OF WISCONSIN INVESTMENT BOARD,

     PLAINTIFFS,

TERRY K. SHOCKLEY, SANDY K. SHOCKLEY
AND SHOCKLEY HOLDINGS LIMITED PARTNERSHIP, INC.,

     INTERVENORS-PLAINTIFFS-APPELLANTS,

TERENCE F. KELLY,

     INTERVENOR,

  V.

MURPHY DESMOND SC, ROBERT A. PASCH
AND WESTPORT INSURANCE COMPANY,

     DEFENDANTS-RESPONDENTS.

---

APPEAL from a judgment of the circuit court for Dane County: RICHARD G. NIESS, Judge. *Affirmed*.

Before Blanchard, P.J., Fitzpatrick, and Graham, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Acting in consultation with tax advisors and attorneys, the large shareholders of a closely held corporation executed what amounted to a sale of the corporation. In an attempt to avoid taxes on that transaction, they used a so-called "midco transaction," in which an intermediary or "middle company" facilitated the sale of the corporation's stock and the (purportedly separate) transfer of a substantial portion of its assets to a third-party purchaser. But the Internal Revenue Service took the position, later upheld by the federal courts, that this was in substance not a stock sale separate from an asset sale but, instead, a single transaction: the direct sale of the corporate assets involving a sale of stock. *See Shockley v. Commissioner*, 872 F.3d 1235, 1245-46, 1250-51, 1256 (11th Cir. 2017) (affirming IRS decision to disregard the midco transaction and assess taxes to transferees accordingly). As a result, large shareholders in the corporation, including corporation founders Terry Shockley and Sandy Shockley, were assessed significant tax liabilities as transferees under federal and state law.[1] *See id.* at 1256.

---

[1] When individual identities matter to our discussion, we refer to Terry Shockley and Sandy Shockley by their full names and to Shockley Holdings Limited Partnership, Inc. as "Shockley Holdings." When referring collectively to the two individuals plus the entity, we use "the Shockleys."

¶2    In the wake of the imposition of these significant tax liabilities, investors in the corporation brought this action in Dane County Circuit Court. At issue in this action is the allocation of responsibility for causing the tax liabilities among the Shockleys, accountants, lawyers, and others. The Shockleys joined the action as intervening plaintiffs. Various parties settled out of the case, pursuant to a *Pierringer* release.[2]

¶3    By the time of trial, the remaining plaintiffs were the Shockleys and the remaining defendants were the law firm Murphy Desmond, an attorney of that firm, and the firm's malpractice insurer. The jury returned verdicts resolving a range of issues regarding alleged negligence and intentional misrepresentations by various individuals and entities. This included jury findings that Terry Shockley and Murphy Desmond were negligent, but also that the defendants who had entered into pretrial settlements with the plaintiffs had committed intentional torts. The circuit court considered post-trial arguments and entered a decision and order granting Murphy Desmond's motion for judgment on the verdict. This was based in part on the court's conclusion that the causal negligence that the jury attributed to Murphy Desmond was fully satisfied through indemnity by operation of the Shockley's pretrial *Pierringer*-release settlements with settling defendants, because the settling defendants were intentional tortfeasors.

---

[2] "A *Pierringer* release operates as a satisfaction of that portion of the plaintiff's cause of action for which the settling joint tortfeasor is responsible, while at the same time reserving the balance of the plaintiff's cause of action against a nonsettling joint tortfeasor," here Murphy Desmond. *See Imark Indus., Inc. v. Arthur Young & Co.*, 148 Wis. 2d 605, 621, 436 N.W.2d 311 (1989); *see also Pierringer v. Hoger*, 21 Wis. 2d 182, 184-85, 124 N.W.2d 106 (1963). Under such a release, the plaintiff "will assume or satisfy that portion of the liability that is determined to be the responsibility of the settling joint tortfeasor." *Imark Indus.*, 148 Wis. 2d at 621.

¶4      The arguments of the Shockleys on appeal fall into three categories. The first two categories of arguments are that the circuit court erroneously exercised its discretion: (1) in making rulings related to evidence or argument regarding the existence of the pretrial *Pierringer*-release settlements and (2) in denying the Shockleys' post-trial motions to change verdicts based on their claims that the verdicts were not supported by sufficient evidence. The third category of arguments is that the circuit court misapplied indemnity principles to determine that Sandy Shockley and Shockley Holdings are not entitled to any recovery in this case beyond what they received in the pretrial settlements.[3]  We affirm on all issues.

## BACKGROUND

¶5      The testimony and exhibits at the ten-day trial include voluminous details about the intricate structure of the midco transaction and related tax law. This included extensive testimony about how the midco transaction came into existence and how it was executed, as well as about the aftermath of IRS review and court resolution of tax issues.  The following is the basic background necessary to understand our resolution of the specific arguments made by the parties on appeal, when considered with additional facts referenced in the Discussion section below.

¶6      In 1985, Terry and Sandy Shockley formed Shockley Communications Corporation ("the corporation"). The corporation came to own a

---

[3] The third category of arguments is pursued by Sandy Shockley and Shockley Holdings only, and not by Terry Shockley.

number of radio and television stations. Investors were brought in to fund expansion of the corporation, which was always closely held.

¶7    In 2000, major shareholders explored a sale of the corporation. Toward that end, Terry and Sandy Shockley and other members of the board of directors discussed with members of an accounting firm now called RSM US, LLP ("RSM") potential modes of selling or reorganizing the corporation. As part of this activity, Stephen Schmidt, then an RSM managing director and tax partner, introduced the Shockleys to Integrated Capital Associates ("ICA").

¶8    Summarizing broadly, there was evidence that RSM's Schmidt and others described the following to the major shareholders as one sale option involving ICA and other entities. ICA would create a new entity, the midco. After a potential purchaser of significant assets belonging to the corporation had been identified, the midco would, in quick succession, (1) buy the shareholders' corporate stock and (2) arrange for funds coming from the asset purchaser to flow back to the shareholders. Through this method, a significant portion of the assets of the corporation would be sold to the actual purchaser, an Illinois-based company. The goal was to avoid tax obligations that would have accrued from a straight asset sale.

¶9    Attorney Pasch of Murphy Desmond undertook a number of activities on behalf of the corporation's shareholders related to the midco transaction. One was to negotiate the terms of the stock sale portion of the transaction among interested persons and entities. Also, after consultation with persons who included Terry Shockley, Pasch reached out to the law firm Curtis, Mallet-Prevost, Colt & Mosle LLP ("Curtis Mallet") to provide an opinion letter related to the potential tax consequences of the midco transaction. Curtis Mallet

provided a written opinion stating that key elements of the transaction should be recognized for federal income tax purposes as a stock sale and not as an asset sale, with favorable tax consequences for the shareholders.

¶10    The midco transaction closed on May 31, 2001.  But the IRS ultimately rejected major premises of the transaction, namely, the premises that by virtue of the corporation allegedly merging into a new entity created for purposes of the midco transaction, the corporation was liquidated and the transaction-related funds that were transferred to its shareholders were tax-free distributions.  *See Shockley*, 872 F.3d at 1245-46.  Applying federal tax law principles (which are not disputed in this appeal), the federal court determined that the midco transaction must be disregarded and that the corporation's shareholders were actually transferees of "its highly appreciated assets."  *See id.* at 1256.  This had the effect of rendering the shareholders "substantively liable under Wisconsin state fraudulent transfer law for the taxes generated by the built-in gain on the appreciated assets" that the corporation sold.  *Id.*

¶11    Former shareholders of the corporation (identified as the plaintiffs in the caption of this appeal and to whom we refer as "the initial plaintiffs") sued Curtis Mallet, one of its partners (William Bricker), RSM, Schmidt, another RSM employee (David Klintworth), Murphy Desmond, and Pasch.  The initial plaintiffs alleged legal malpractice by Curtis Mallet, Bricker, Murphy Desmond, and Pasch, and alleged negligence by RSM, Schmidt, and Klintworth.  They also alleged fraud and civil conspiracy by Curtis Mallet, Bricker, RSM, Schmidt, and Klintworth, and sought declaratory judgment ordering these defendants to indemnify and hold harmless these plaintiffs from all damages arising from the defendants' negligence.

6

¶12   The Shockleys and, later, corporation shareholder Terence Kelly (collectively, "the intervening plaintiffs"), successfully moved to intervene and filed intervenors' complaints against the same set of defendants, with allegations paralleling those in the operative complaint filed by the initial plaintiffs. Litigation in the circuit court was delayed in part to await resolution of the separate tax litigation, which was eventually resolved against the shareholders.

¶13   In February 2018, the initial plaintiffs and the intervening plaintiffs, together with all defendants, filed a joint motion for the court to recognize a set of settlements under a *Pierringer* release. Under the release, all defendants except Murphy Desmond and Pasch were settling as joint tortfeasors, leaving Murphy Desmond and Pasch as the sole remaining defendants for trial. We refer to the set of defendants who settled using the *Pierringer* release as "the settling defendants." The circuit court accordingly entered a final judgment resolving: all claims by the initial plaintiffs and intervening plaintiffs against the settling defendants; all cross-claims in either direction between the settling defendants and Murphy Desmond and Pasch; and all cross-claims in either direction between the two groups of settling defendants: Curtis Mallet and Bricker; and RSM, Schmidt, and Klintworth. In the wake of these events, the court dismissed all of the plaintiffs except the Shockleys from the lawsuit.

¶14   This left for trial the Shockleys as the plaintiffs and Murphy Desmond, Pasch, and their malpractice insurance carrier, Westport Insurance Company, as the defendants. From this point forward, we will refer to the three defendants collectively as "Murphy Desmond" unless an individual reference is necessary.

¶15    In January 2019, the Shockleys filed an amended complaint against Murphy Desmond, based on a claim of legal malpractice. The amended complaint continued to refer to the settling defendants' existence and their related conduct. But the amended complaint removed the claims previously made against the settling defendants, and listed only Murphy Desmond as a named defendant. The amended complaint alleged that, as a result of negligence by Murphy Desmond in connection with the midco transaction, the Shockleys "owe in excess of $40,000,000 to the IRS," which "otherwise could have avoided."[4]

¶16    During trial, as requested by Murphy Desmond and over opposition by the Shockleys, the circuit court allowed the parties to make references to the substance of the *Pierringer* settlement. The court ruled that the jury needed to hear this background to properly assess the credibility of the Shockleys as the settling plaintiffs. The jury heard testimony that RSM and Curtis Mallet had each settled for approximately $25 million each. However, before the jury heard this testimony the court gave the jury a cautionary instruction, which is quoted in full in the Discussion section below.

¶17    In special verdicts, the jury provided 25 findings. These included the following:

- Murphy Desmond was negligent in providing legal services to the Shockleys, and its negligence was 10 percent of the total negligence;

- Terry Shockley, RSM, and Curtis Mallet were each negligent, and each responsible for 30 percent of the total negligent conduct that caused damages to Terry Shockley;

---

[4] For context, we note that at trial Terry Shockley testified that his total obligation to the IRS at the time of trial was approximately $46 million.

8

- In addition to its negligence, RSM made "an intentional misrepresentation of fact" to the Shockleys "intending to deceive and induce the Shockley plaintiffs to act upon it to their damage"; and

- In addition to its negligence, Curtis Mallet "intentionally misrepresent[ed] its prior midco experience to the corporation's shareholders intending to deceive and induce the Shockley plaintiffs to act upon it to their damage."

¶18 The parties dispute whether the circuit court properly interpreted the damages reflected on the special verdict. For reasons explained below, we agree with Murphy Desmond that the circuit court correctly determined that the jury found that:

- The midco transaction caused a total of $13 million in damages to Terry Shockley, $13 million to Sandy Shockley, and $7.4 million to Shockley Holdings;

- Of those total amounts, RSM's intentional conduct caused $6 million in damages to Terry Shockley, $6 million to Sandy Shockley, and $2.2 million to Shockley Holdings, and Curtis Mallet's intentional conduct also caused $6 million in damages to Terry Shockley, $6 million to Sandy Shockley, and $2.2 million to Shockley Holdings.

- This left $1 million in damages to Sandy Shockley and $3 million to Shockley Holdings due to the combined negligence of RSM, Curtis Mallet, Murphy Desmond, and Terry Shockley.

¶19 The circuit court denied the Shockleys' post-trial motions and granted Murphy Desmond's motion for a judgment on the verdict based on the jury's findings of intentional conduct by RSM and Curtis Mallet, which the court determined entitled Murphy Desmond to complete indemnity based on the *Pierringer* release. The Shockleys appeal.

9

**DISCUSSION**

¶20   We first address the Shockleys' three arguments challenging discretionary decisions by the circuit court regarding what the jury could be allowed to learn, or what the parties could properly argue, regarding the existence or contents of the pretrial settlements that the initial plaintiffs and the Shockleys entered into with the settling defendants.  Then we address their three arguments that the court erroneously exercised its discretion in denying motions to change special verdict answers based on a lack of sufficient evidence.  Finally, we address their argument that the circuit court erred in determining the proper effect on damages of the pretrial settlements with the settling defendants, based on the specific verdicts returned by the jury and applicable legal standards.

## I.   EVIDENCE AND ARGUMENT REGARDING PRETRIAL SETTLEMENTS

¶21   In three related arguments, the Shockleys contend that the circuit court erroneously exercised its discretion in:  allowing Murphy Desmond to offer into evidence the substance of the pretrial settlements; declining to order a new trial based on statements made by counsel for Murphy Desmond in his closing argument related to the pretrial settlements; and allowing Murphy Desmond to offer the Shockley's pre- and post-settlement complaints as evidence.

¶22   Regarding the first and third of these issues, we review a circuit court decision to admit or exclude evidence under an erroneous exercise of discretion standard.  *Martindale v. Ripp*, 2001 WI 113, ¶28, 246 Wis. 2d 67, 629 N.W.2d 698.  "An appellate court will sustain an evidentiary ruling if it finds that the circuit court examined the relevant facts; applied a proper standard of law; and using a demonstrative rational process, reached a conclusion that a reasonable

10

judge could reach." ***State v. Sullivan***, 216 Wis. 2d 768, 780-81, 576 N.W.2d 30 (1998). Similarly, regarding the second issue, a motion for a new trial on the ground of error at trial is addressed to the circuit court's discretion. ***Klein v. State Farm Mut. Auto. Ins. Co.***, 19 Wis. 2d 507, 510, 120 N.W.2d 885 (1963). A ruling on such a motion will not be disturbed unless there was an erroneous exercise of discretion. ***Id.***

### A. Settlements As Evidence

¶23 The Shockleys argue that the circuit court erroneously exercised its discretion in allowing Murphy Desmond to offer as evidence at trial certain facts regarding the settlements with the settling defendants.[5] They contend that this information was not subject to any "applicable exception under WIS. STAT. § 904.08 [(2019-20)], and the probative value of the evidence was substantially outweighed by the danger of unfair prejudice."[6] Murphy Desmond argues in part

---

[5] More precisely, in their briefing on appeal the Shockleys speak in terms of the circuit court admitting the pretrial settlements into evidence. But they fail to direct us to record support regarding the admission of settlement papers, or to the admission of any document summarizing the contents of the settlements. However, with the benefit of a citation in the Murphy Desmond brief and our review of the record we understand that the circuit court apparently did not admit settlement papers or any paper summary into evidence, but instead allowed Murphy Desmond to ask several questions about the content of the settlements over the course of relatively brief testimony. The Shockleys do not contend that the jury received inaccurate or misleading factual information regarding the settlements.

Separately, the Shockleys' argument on this issue drifts, attempting to bring in later events at trial, such as the closing argument of Murphy Desmond, discussed separately below. We address in this subsection of the opinion whether the circuit court erroneously exercised its discretion in allowing information regarding the settlements to be admitted, based on the contemporaneous arguments of the parties and the nature of the trial evidence that the court could have reasonably anticipated at the time it made its challenged decision.

[6] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

that the court properly exercised its discretion because it could reasonably determine both that the substance of the settlements were admissible to show bias or prejudice of witnesses created by the settlements, and also that this evidence would not have a tendency to affect the outcome through improper means. We conclude that the Shockleys fail to show that the circuit court erroneously exercised its discretion on this issue. More specifically, the Shockleys fail to persuade us, through arguments based on record evidence applied to the correct substantive legal standard, that the court erroneously exercised its discretion in determining that the ability of the jury to fairly evaluate all the evidence would be enhanced by the admission of this evidence.

¶24    WISCONSIN STAT. § 904.08 provides:

> Evidence of furnishing or offering or promising to furnish, or accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. *This section does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness*, negat[]ing a contention of undue delay, proving accord and satisfaction, novation or release, or proving an effort to compromise or obstruct a criminal investigation or prosecution.

(Emphasis added.)

¶25    Our supreme court has interpreted WIS. STAT. § 904.08 and explained that a circuit court may permit the admission of settlement evidence when a party shows "prejudice or bias by showing that a witness changed his or her testimony *or that the posture of a settling party was significantly different as a result of the settlement*." **Morden v. Continental AG**, 2000 WI 51, ¶83, 235

12

Wis. 2d 325, 611 N.W.2d 659 (emphasis added).  Thus, it can be enough for a circuit court to determine that a settlement has left a settling party that is headed for a trial, here the Shockleys, in a "posture" in the litigation that is significantly different than it would have been absent the settlement.  To state the obvious, if an actual change in testimony were required, as the Shockleys seem to suggest at points in their argument, there would have been no need for the supreme court to add the second phrase in *Morden*.  We see no reason that "significantly different" "posture" in this context cannot include significant changes in incentives for a settling plaintiff such as the Shockleys in litigation against remaining defendants.

¶26    The Shockleys argue that the circuit court could not properly allow the jury to learn of the settlements "in the absence of evidence of witness bias," but in making that argument they ignore the circuit court's finding that they necessarily had a bias due to the settlements they entered into.  Further, they do not come to grips with the court's further findings that in this litigation they first vigorously claimed "fraud," "negligence," and "malfeasance" by the settling defendants, but then "as a result of" the settlements there was a "dramatic change in the posture of this case," so that by the time of trial the Shockleys were in some respects "steriliz[ing] out of the case" their earlier strong claims against the settling defendants and narrowly placing blame on Murphy Desmond alone.

¶27    We conclude that these findings in this case provided a sufficient basis under *Morden* for the circuit court's evidentiary decision.  The Shockleys fail to provide an interpretation of *Morden*'s phrase "that the posture of a settling party was significantly different as a result of the settlement" which is distinct from the one we now apply.  More generally, they fail to adequately address what we see as the clear import of the language in *Morden* interpreting WIS. STAT.

13

§ 904.08 to grant circuit courts broad discretion on this topic. *See Morden*, 235 Wis. 2d 325, ¶¶81-82, 84.

¶28 The Shockleys do not offer a developed argument that the *Pierringer* release did not significantly change their posture in this litigation. The circuit court had an adequate basis to determine that their posture in the case shifted significantly from an attempt to assign negligence or intentional tort liability to a broad range of actors (RSM and its employees; Curtis Mallet and its employees; and Murphy Desmond and its employees) to an attempt to assign negligence liability to only Murphy Desmond to the maximum degree possible. It is true that this shift was to a large degree inherent in the particular settlements that the Shockleys decided to enter into. Nevertheless, the Shockleys decided to enter into those settlements and proceed to trial against Murphy Desmond alone.[7]

¶29 The Shockleys argue that affirming the circuit court on this issue could be viable only if WIS. STAT. § 904.08, as interpreted in *Morden*, permits circuit courts to admit evidence regarding settlements in "*every* case involving multiple defendants." (Emphasis in original.) But, both experience and logic suggest to us that there could be other multi-defendant, partial settlement scenarios in which the nature of a pretrial settlement could not reasonably be said to *significantly* change the posture of the settling party. *See Anderson v. Alfa-Laval Agri, Inc.*, 209 Wis. 2d 337, 349-50, 564 N.W.2d 788 (1997) ("no contention … that the posture of any of the settling defendants was significantly different as a

---

[7] The Shockleys point out that the *Pierringer* settlements were entered into "nearly two years before trial," and that before that time the Shockleys had alleged negligence and intentional torts by the settling defendants. But this is entirely consistent with the reasoning of the circuit court, and the Shockleys fail to explain how this timing undermines that reasoning in any way.

result of" *Pierringer* release among them). Further, under the circumstances specific to this case, the circuit court had a reasonable basis to determine, for example, that the jury was entitled to learn of the strong incentives that the settlements created for the Shockleys to testify and select strategies at trial under the "significant posture change" rationale in *Morden*. Put differently, the circuit court had a reasonable ground to determine that, as a direct result of the settlements, by the time of trial the Shockleys had significantly shifted course in the litigation based on a strong incentive, created by the settlements, to cast the settling defendants in the most positive light and to cast Murphy Desmond in the most negative light.

¶30 The Shockleys argue that the references to the contents of the settlements allowed at trial unfairly prejudiced them "by suggesting [to the jury] that the settling defendants did wrong." But both sides at trial took the position that the settling defendants did at least some "wrong" in connection with the midco transaction. Further, the circuit court explicitly directed the jury in a cautionary instruction that it "must not consider" the settlements-related evidence "as evidence of the truth of the claims against those defendants," but that the jury could consider the evidence "only to the extent that you believe it may bear on the credibility of the testimony of any witness including the plaintiffs and the settling parties." *See **State v. LaCount***, 2008 WI 59, ¶23, 310 Wis. 2d 85, 750 N.W.2d 780 ("Jurors are presumed to have followed jury instructions.").[8]

---

[8] The court instructed the jury as follows:

(continued)

¶31     The Shockleys argue that it was unfairly prejudicial to them for the jury to learn that "the Shockleys already had been compensated" by the settling defendants.  While not clearly stated, the Shockleys argue, in effect, that the circuit court should have understood that the *sizes of the settlements*, in and of themselves (approximately $25 million each from two settling defendants), improperly suggested to the jury that the Shockleys had been *adequately* compensated before trial by the settling defendants, and that therefore the Shockleys did not need to be awarded more in damages from Murphy Desmond, regardless of its fault.  There are multiple weaknesses in this thinly developed argument as a challenge to a discretionary circuit court ruling, but the following two points are sufficient to defeat it.

¶32     First, again on this topic, the cautionary instruction explicitly directed the jury not to reach this conclusion.  Second, even assuming that the jury ignored the cautionary instruction, the Shockleys fail to explain why the circuit court should have determined that the sheer size of the settlements would cause

---

> You will hear evidence that there was a settlement between the plaintiffs and Curtis Mallet, William Bricker, [Eduardo] Cukier, RSM …, Steven Schmidt, and David Klintworth.  Those parties are no longer defendants in this action as a result of that settlement.
>
> You must not consider this evidence about the settlements as evidence of the truth of the claims against those defendants.  You may consider this evidence only to the extent that you believe it may bear on the credibility of the testimony of any witness including the plaintiffs and the settling parties.  Any award of damages to any plaintiff must be made without taking into account any amounts the plaintiff may have received as a result of that settlement and any determination of percentages of fault attributed to any party must be made without regard to that settlement.

Eduardo Cukier was an attorney at Curtis Mallet.

16

the jury to unfairly minimize negligence attributable to Murphy Desmond or unfairly minimize total damages to which the Shockleys were entitled. Put differently, the Shockleys' argument rests on the unsupported premise that the circuit court should have understood that, in answering the specific verdict questions, jurors would make highly unreasonable uses of the size of the settlements to the disadvantage of the Shockleys in reaching its verdicts.

¶33 The Shockleys point to WIS. STAT. § 904.03, under which relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." But they do not develop an argument, at least not one that we have not already addressed, that the court was obligated to determine that this evidence must be excluded under any of the factors listed in or suggested by § 904.03.

### B. Closing Argument

¶34 In a related argument, the Shockleys contend that the circuit court erroneously exercised its discretion in declining to order a new trial based on statements made by counsel for Murphy Desmond in his closing argument addressing the pretrial settlements. The Shockleys contend that the circuit court erroneously exercised its discretion because the statements invited the jury "to consider the settlements for the impermissible purpose of determining the merits of the Shockleys' claims, the merits of Murphy Desmond's defenses, and the amount of damages to be awarded in response to the questions presented on the verdict form." We conclude that counsel made two related improper statements,

17

but we reject the Shockleys' argument that the circuit court erroneously exercised it discretion in denying the motion for a new trial on this basis.[9]

¶35 The following is the pertinent transcript passage from the closing argument, with emphasis on the references that we initially address in our discussion:

> MURPHY DESMOND COUNSEL: [Counsel for the Shockleys] should be blushing, because he's the one who got up at the beginning of this trial and talked about this case as if [the Shockleys] had never sued—they had never accused [RSM] and Curtis Mallet of doing anything wrong. Talked about this trial as if there was no issue in this case whatsoever about whether [RSM] and Curtis Mallet had done anything wrong. Didn't tell you that they'd settled with Curtis Mallet and [RSM]. Didn't tell you *they got enormous amounts of money because they're the true culprits here*, of course. And didn't tell you that because they settled with them. His clients had night and day changed their allegations to drop all the allegations against those people and now take the posture that he's taking now, that this is, essentially, all our fault. Even though everything that his clients alleged against Curtis Mallet has been proven. *Even though the settlement, in my opinion, is an acknowledgment that they've been proven.*
>
> SHOCKLEYS COUNSEL: Objection.
>
> MURPHY DESMOND COUNSEL: And even though common sense–
>
> SHOCKLEYS COUNSEL: Objection. That's not appropriate argument. There's no admission or inference that should be drawn from a settlement.
>
> MURPHY DESMOND COUNSEL: I didn't say there was an admission.

---

[9] Murphy Desmond argues that the Shockleys forfeited this issue because they did not move for a mistrial at the same time that he made a contemporaneous objection to the statements, but we need not address this argument given our resolution of the issue on the merits in favor of Murphy Desmond.

> SHOCKLEYS COUNSEL: That is exactly what you said.
>
> THE COURT: Overruled.
>
> MURPHY DESMOND COUNSEL: So I don't think that's the most important issue in this case. I think the way the case has been presented [through] the evidence is far more important. But to suggest that somehow I was the one who didn't properly explain things to you on opening statement, in the face of all that, is just incredible. But, moving on.

(Emphasis added.)

¶36    We conclude that, in the references that we emphasize, counsel improperly stepped over the line. The Shockleys' prompt objection should have been sustained. In arguing that the large settlements occurred because RSM and Curtis Mallet were the "true culprits" and that the settlements were in themselves "proof" of this, counsel explicitly invited the jury to ignore the cautionary instruction that the circuit court had given the jury about improper reliance on the evidence regarding the settlements.

¶37    However, for the following three reasons, we conclude that the Shockleys fail to show that the circuit court erroneously exercised its discretion in failing to order a new trial based on these references. First, as the full passage quoted above reveals, the improper statements were essentially isolated references. Even just focusing on the quoted passage, most of what counsel conveyed was not objectionable. Instead, it primarily consisted of conventional parrying with opposing counsel about the timing and substance of each side's articulation of opposing theories of the case and what the evidence showed. Relatedly, as the quoted passage above reveals, even though the court overruled the objection, counsel for Murphy Desmond did not exploit that ruling. Counsel backed away from the subject and took the immediate position that the substantive evidence in

the case was what mattered. The Shockleys do not object to any other passage in the Murphy Desmond closing argument except what we have quoted above.

¶38     Second, we discern no reason to conclude that the jury would have fixated on the improper references and applied them in some improper matter in its deliberations, in direct contradiction to a clear instruction from the court. *See* *LaCount*, 310 Wis. 2d 85, ¶23.

¶39     Third, as noted above, the trial testimony regarding the settlements was not extended. It would have been all the more unreasonable for the jury to have allowed that limited evidence, together with the improper references, to improperly influence its findings, superseding the relevant evidence presented over the course of the ten-day trial, which included many exhibits. We are not persuaded that the circuit court had good reason to think that there is a reasonable likelihood that the jury made improper use of this reference when the jury addressed genuine issues of fault and damages as set forth in the instructions and the special verdict form.

### C.     Admission Of Pleadings

¶40     The Shockleys argue that they are entitled to a new trial because the circuit court erroneously exercised its discretion in admitting their pre- and post-settlement complaints as evidence at trial, because the pleadings were consistent, "there was no showing of changed testimony, and the probative value of the prior pleadings was outweighed by the risk of unfair prejudice." Murphy Desmond argues that the court had a reasonable basis to determine that the pleadings were admissible and not unfairly prejudicial. We assume without deciding that the circuit court erroneously exercised its discretion in admitting the complaints as evidence and conclude that the assumed error was harmless.

20

¶41    A new trial will not be granted on the basis of an erroneous circuit court ruling (here, an assumed erroneous ruling) unless the "ruling affected the substantial rights of the parties." *See* ***Estate of Hegarty ex rel. Hegarty v. Beauchaine***, 2006 WI App 248, ¶152, 297 Wis. 2d 70, 727 N.W.2d 857 (citing WIS. STAT. §§ 805.18, 901.03). "The substantial rights of the parties are affected only if there is a reasonable possibility that the error contributed to the outcome of the case." *Id.* (citing ***Martindale***, 246 Wis. 2d 67, ¶¶31-32).

¶42    Murphy Desmond succinctly points out a paradox in the Shockleys' argument:  How could there be a reasonable possibility that introduction of the complaints contributed to the outcome of the case if, as the Shockleys themselves contend, the pleadings were consistent?  The Shockleys do not solve the paradox, conceding the point through their failure to answer this question in their reply brief.  *See* ***United Coop. v. Frontier FS Coop.***, 2007 WI App 197, ¶39, 304 Wis. 2d 750, 738 N.W.2d 578 (appellant's failure to respond in reply brief to an argument made in response brief may be taken as a concession).

## II.    SUFFICENCY OF EVIDENCE TO SUPPORT SPECIFIC JURY VERDICT ANSWERS

¶43    The Shockleys contend that the circuit court should have granted their motions to change the jury's answers to special verdict questions because there was insufficient evidence that RSM was negligent, that Terry Shockley was negligent, or that RSM or Curtis Mallet committed fraud.  We reject each argument.

¶44    A circuit court may change a jury's answer to a special verdict question if there is insufficient evidence to support the answer.  *See* WIS. STAT. § 805.14(5)(c); *see also* § 805.14(1) ("No motion challenging the sufficiency of

the evidence as a matter of law to support a verdict, or an answer in a verdict, shall be granted unless the court is satisfied that, considering all credible evidence and reasonable inferences therefrom in the light most favorable to the party against whom the motion is made, there is no credible evidence to sustain a finding in favor of such party.").

¶45     On review of a circuit court decision on this topic, we also search for credible evidence and reasonable inferences arising from credible evidence to sustain the jury's verdict. *Gaethke v. Pozder*, 2017 WI App 38, ¶14, 376 Wis. 2d 448, 899 N.W.2d 381.  Further, when, as here, the circuit court has approved the jury's verdicts on motions after the verdict, we give even greater deference to the verdicts and will not overturn any unless "'there is such a complete failure of proof that the verdict must be based on speculation.'" *Kuklinski v. Rodriguez*, 203 Wis. 2d 324, 331, 552 N.W.2d 869 (Ct. App. 1996) (quoted source omitted).

### A.     Sufficiency Of Evidence Of Negligence By RSM

¶46     The Shockleys argue that the circuit court should have changed the jury's verdict that RSM was negligent, which both sides appear to agree was based primarily if not wholly on evidence that RSM allegedly breached the standard of care for accountants by failing to properly disclose a referral fee that RSM was to receive if the midco transaction closed.  The Shockleys' argument is confusing, but at least at points they contend that the only evidence offered by Murphy Desmond on the pertinent standard of care for accountants was insufficient, because the standard of care expert called by Murphy Desmond did not provide sufficient testimony on this topic.  Murphy Desmond responds that there was credible evidence that could support a reasonable inference supporting the negligence verdict.

¶47    The Shockleys do not dispute Murphy Desmond's argument that there was trial evidence from which the jury could have inferred that RSM was subject to pertinent accounting rules that the expert testified were violated by RSM, even when putting aside the testimony of the standard of care expert.  This other trial evidence including testimony by RSM witnesses.  The jury was free to give any testimony on this topic as much or as little weight as it deemed proper.  The Shockleys repeatedly identify their argument on this issue as addressing whether there was sufficient evidence.  But they then confusingly and without explanation shift to the topic of whether the standard of care expert could properly be allowed to testify, based on his qualifications.  The case law that they cite addressing the standards that trial courts apply to address the *admissibility* of expert testimony is not pertinent to what they identify as a *sufficiency* argument.  It was for the jury to determine, based on the admissible evidence, what weight to place on the testimony of all witnesses, including that provided by the standard of care expert.

**B.    Sufficiency Of Evidence Of Negligence By Terry Shockley**

¶48    The Shockleys argue that the circuit court should have changed the jury's verdict that Terry Shockley was negligent because "[t]here was no evidence in the record to support a finding of contributory negligence" in light of the evidence that "he followed the advice of his professional advisors."  Murphy Desmond responds that the evidence was sufficient because it provided a reasonable basis for the jury to find that Terry Shockley was experienced in business, that he never received advice that he should close on the midco transaction, and that he was affirmatively advised of risks that the tax avoidance scheme would not be accepted by the IRS.

23

¶49 We affirm the circuit court decision based on evidence that includes the following testimony given by Pasch, which reveals that the negligence verdict did not have to be based on speculation, *see Kuklinski*, 203 Wis. 2d at 331:

- "[F]rom the get-go" on the midco transaction, Pasch's "contact was Terry Shockley," and other corporation shareholders formally authorized Shockley to act for them in connection with the transaction;

- Pasch's own confidence in the midco transaction was influenced by background information that Terry Shockley had obtained regarding ICA and its principals, and it was Shockley who informed Pasch about at least some of the tax advice provided by Curtis Mallet;

- Before the agreement for the midco stock purchase was signed, Pasch told Terry Shockley that Pasch had asked RSM for warranties or indemnification agreements and RSM had said no, and this concerned both Pasch and Shockley;

- Before the closing of the midco transaction, RSM and Curtis Mallet warned of the possibility of a "recharacterization" of the transaction by the IRS, which would disregard the midco aspect, and Pasch never told Terry Shockley that there was no risk of a recharacterization;

- Even though Pasch worked with Terry Shockley and others on the midco transaction, Pasch was never asked to provide an opinion on the potential tax consequences and he was not qualified to provide such an opinion;

- More generally, Pasch was not asked by anyone to estimate the tax liability that might be incurred if the IRS recharacterized the transaction;

- Pasch was not aware of Terry Shockley soliciting professional advice on the midco transaction from anyone other than RSM and Curtis Mallet;

- Terry Shockley never said anything to Pasch that indicated that Shockley did not understand the risk that the midco transaction might result in recharacterization by the IRS and a large tax obligation; and

- Pasch never told Terry Shockley that he should sell his stock in the midco transaction, and Shockley never asked Pasch if he should do so.

¶50     We conclude that, when considered in light of other evidence at trial, this evidence raised reasonable inferences that Shockley:  took an active role in the midco transaction; was aware of a significant risk that, as eventually occurred, it would not survive IRS scrutiny, with calamitous tax consequences; and failed to follow up on this knowledge by sufficiently investigating this significant risk, and ultimately made the unreasonable decision to proceed with the transaction anyway.[10]

¶51     After Murphy Desmond cites to this evidence, the Shockleys fail to explain why it is not sufficient to show some degree of negligence on his part under our extremely deferential standard of review, even if there was evidence contrary to Pasch's testimony and even if Terry Shockley received at least some bad advice from professionals.  The jury was not obligated to accept the Shockleys argument at trial that Terry Shockley was not at all negligent because he merely passively relied on bad professional advice, and the circuit court reasonably determined that the jury had a basis to weigh the evidence to reject this position.

---

[10] This conclusion is consistent with the well-informed view of the circuit court in addressing post-trial motions:

> Viewing the evidence in the light most favorable to the jury verdict, [Terry Shockley] is a savvy businessman who was fully involved throughout the many months of negotiations and consummation of the midco transaction, and understood its significant risks for substantial tax liability.  He was integrally involved in all major decisions regarding the stock sale and midco transaction, and was the prime mover on behalf of all the plaintiffs.

### C. Sufficiency Of Evidence Of Intentional Torts By RSM And Curtis Mallet

¶52 The Shockleys argue that the circuit court should have changed the jury's verdicts that RSM and Curtis Mallet both committed fraud in connection with the midco transaction, because fraud was not shown to have been committed by either RSM or Curtis Mallet through evidence that was clear, satisfactory, and convincing.[11] Murphy Desmond responds that there was ample evidence that RSM and Curtis Mallet representatives affirmatively lied about their relevant experience and that RSM, at least for a time, failed to disclose a $1 million commission, and this evidence was sufficient to support fraud verdicts.

¶53 Regarding the representations of relevant experience, the Shockleys' brief argument, when boiled down, amounts to the assertion that what the jury heard was evidence of mere "exaggeration" that the jury was obligated to view as mere "puffery." The Shockleys do not challenge the substance of Murphy Desmond's summary of evidence, including admissions by RSM and Curtis Mallet representatives about the nature of their representations and the lack of basis for them. The Shockleys fail to show that this evidence did not provide a reasonable basis for the jury to find by clear, satisfactory, and convincing evidence that both RSM and Curtis Mallet made material, intentional misrepresentations that they had experience in these complex transactions, which were not mere "puffery." The Shockleys do not contend that the jury was improperly instructed

---

[11] Civil fraud claims must be proven by clear, satisfactory, and convincing evidence, which means evidence that produces a greater level of certainty than the preponderance standard that required to prove many civil claims. *See* **Wangen v. Ford Motor Co.**, 97 Wis. 2d 260, 299, 294 N.W.2d 437 (1980) (citing **Kuehn v. Kuehn**, 11 Wis. 2d 15, 26, 104 N.W.2d 138 (1960)).

regarding what constitutes a material, intentional misrepresentation.[12] Because a material, intentional misrepresentation of any kind by RSM would suffice to sustain the fraud verdict against it, we need not address the commission issue involving RSM.

### III. INDEMNIFICTION CONSEQUENCES OF JURY FINDINGS OF INTENTIONAL TORTS BY RSM AND CURTIS MALLET

¶54    As summarized above, in contrast to Terry Shockley, neither Sandy Shockley nor Shockley Holdings was found at fault by the jury and Murphy Desmond was found to be 10 percent responsible for all negligence causing damage. Based on those facts, Sandy Shockley and Shockley Holdings filed a post-trial motion arguing that, if the circuit court did not grant a new trial, "judgment should be entered against Murphy Desmond for 10% of the jury's finding of damages caused by negligence" in favor of each of them, which they argued was "$1.3 million to Sandy Shockley, and $740,000 to Shockley Holdings."

¶55    Murphy Desmond made an argument based on the indemnity doctrine and the existence of the *Pierringer* releases that would result in a judgment in its favor, dismissing all claims. The argument was that, under *Fleming v. Threshermen's Mutual Ins. Co.*, 131 Wis. 2d 123, 388 N.W.2d 908 (1986), a negligent tortfeasor is entitled to indemnity from an intentional tortfeasor when the intentional tortfeasor's liability is joint with that of the negligent

---

[12] The special verdict form did not ask the jury to identify a specific misrepresentation made by RSM but instead asked only if RSM made "an intentional misrepresentation of fact to the Shock[l]ey plaintiffs intending to deceive and induce the Shockley plaintiffs to act upon it to their damage?"

tortfeasor. Said more completely, Murphy Desmond's argument follows two steps. First, a defendant found by the jury to be a negligent tortfeasor (here, Murphy Desmond) has a right to indemnity from any defendants found by the jury to be intentional tortfeasors (here, RSM and Curtis Mallet) whose liability was joint with each other and the negligent tortfeasors. *See id.* at 130. Second, the *Pierringer* release of RSM and Curtis Mallet relieved Murphy Desmond of liability to Sandy Shockley and Shockley Holdings, because the liability of intentional joint tortfeasors RSM and Curtis Mallet must be imputed to Sandy Shockley and Shockley Holdings as settling plaintiffs. *See id.* at 131 (effect of *Pierringer* releases to impute settling defendant's liability for contributions to settling plaintiff applies to indemnity as well).

¶56     The circuit court agreed with Murphy Desmond's argument, and we concur with the court's analysis.

¶57     Whether a party has a right to indemnification in the context of a *Pierringer* release is an issue of law that we review de novo. *Fleming*, 131 Wis. 2d at 127.

¶58     Sandy Shockley and Shockley Holdings rest their entire indemnity argument on the proposition that the intentional conduct of RSM and Curtis Mallet was, as they put it, shown to be "unconnected" from the negligent conduct of Murphy Desmond, and therefore Murphy Desmond may only be indemnified for the portion of its negligence that is "fairly attributable to the conduct of" the intentional tortfeasors. However, as the circuit court noted and Murphy Desmond now contends, the Shockleys did not pursue a theory at trial that any damages were caused exclusively by negligent conduct. Instead, their claim at trial was for damages for attorneys' fees, taxes, interest, and penalties all flowing from the

28

adverse tax determinations as a result of the combined effects of the negligent and intentional conduct of multiple parties.

¶59     This readily distinguishes the trial evidence that was at issue in the primary authority on which Sandy Shockley and Shockley Holdings rely, ***Imark Industries v. Arthur Young & Co.***, 148 Wis. 2d 605, 436 N.W.2d 311 (1989). Our supreme court concluded in ***Imark*** that specific evidence had been adduced at trial that could have supported both (1) joint liability between negligent and intentional tortfeasors, which would call for indemnification, and (2) negligence that was "unaffected by any intentional misrepresentations" by the co-defendants whose liability was discharged by covenants not to sue, which would not call for indemnification. ***Id.*** at 628-29. For this reason, the court concluded, a new trial was required to determine, for indemnity purposes, what portion of the liability for negligent misrepresentation was "attributable" to negligent reliance on intentional misrepresentations. ***Id.***

¶60     It is not necessary for us to determine whether Sandy Shockley and Shockley Holdings possibly *could have* tried their case in a different way that would have brought ***Imark*** into play. They concede through silence that they cannot point to evidence of damages caused by negligence of Murphy Desmond that could not also be attributed to, or related in some manner to, intentional misrepresentations of RSM and Curtis Mallet. The circuit court pointed out in its decision on this issue that, even after the court explicitly invited them "to cite to any record evidence of causal negligence on the part of Murphy Desmond that was not joint with RSM and Curtis Mallet's liability within the meaning of ***Imark*** and ***Fleming***," they were unable to do so. This remains the case in their briefing on appeal.

29

¶61     It is unclear, but Sandy Shockley and Shockley Holdings may intend to argue that their position that there should be no indemnification is bolstered by an interpretation of the damages verdicts that at least in some respects differs from the interpretation of the circuit court. In any case, we fail to discern a developed argument undermining the damages interpretation of the circuit court, much less one that could affect the indemnity issue. The court's interpretation was that, by its terms, the special verdict stated the damages as summarized *supra* at ¶18. We agree with this interpretation of the verdict form, and Sandy Shockley and Shockley Holdings are unclear in expressing a contrary view.

¶62     They argue at one point that "the jury intended to award $19 million to Sandy Shockley, allocated between negligence ($13 million) and intentional conduct ($6 million)." As part of this position, the Shockleys argue that the fact that the jury found identical sums attributable to the intentional tortfeasors ($6 million for each) demonstrates that these separate findings were of "a single, joint amount" of damages due to intentional conduct. We fail to see a basis for this position. The jury found that there was not only $6 million in damages to Sandy Shockley due to intentional conduct of RSM but also $6 million in damages to her due to intentional conduct of Curtis Mallet. And to repeat, whatever the Shockleys intend to argue regarding the proper interpretation of the special verdicts, they fail to explain how any such argument could support their argument against indemnity.

¶63     For all of these reasons, we affirm the judgment of the circuit court.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.